William J. DIMOND, Plaintiff,

v.

RETIREMENT PLAN FOR EMPLOY-
EES OF MICHAEL BAKER CORPO-
RATION AND AFFILIATES, Michael
Baker Corporation, and Michael Baker
III, Defendants.

Civ. A. No. 83–408.

United States District Court,
W.D. Pennsylvania.

March 7, 1983.

R.A. King, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for plaintiff.

James H. Hardie, James J. Restivo, Jr., Michael J. Betts, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendants.

## BENCH OPINION

COHILL, District Judge.

### I.

### *Background*

This case comes before us on a complaint seeking, originally, a request for a Temporary Restraining Order ("TRO") to be followed by a preliminary injunction, restraining and enjoining two of the defendants from proceeding to purchase any shares of stock in Michael Baker Corporation, one of the defendants. Michael Baker stock is traded on the American Stock Exchange.

The request for the TRO was withdrawn when the defendants agreed to maintain the *status quo* until the Court conducted a hearing and ruled on the request for a preliminary injunction. We held such a hearing and took testimony on March 3 and 4.

In accordance with Fed.R.Civ.P. 65(d), we make the following findings:

Plaintiff, William J. Dimond, is an individual citizen of Allegheny County, Pennsylvania, and a shareholder owning 65,077 shares of Michael Baker Corporation ("the Corporation") common stock. He is a director of the Corporation and a "participant" (as defined in the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002) in the Retirement Plan for Employees ("The Pension Plan") of the Corporation.

894

The defendants are the Pension Plan, the Corporation, which is a Pennsylvania Corporation, and Michael Baker III, Chairman and Chief Executive Officer of the Corporation. The business of the Corporation is consulting and civil engineering design services.

By a letter agreement prepared by company counsel at Mr. Baker's request, the purchase of 250,000 shares of the common stock of the Corporation was arranged. The seller was John C. Clark, a Canadian, who either owned in his own right, or represented owners holding the 250,000 shares.

## II.

### The Agreement

The Agreement provided in part that "we, on behalf of Michael Baker Corporation, Michael Baker Corporation Pension Trust and Michael Baker III make the following offer ..." (Plaintiff's Exhibit 6). The letter then went on to outline the terms of the purchase. It was signed by James H. Hardie, counsel for Mr. Baker and the Corporation.

The letter was dated February 14, 1983. The closing was to be February 24, 1983, but was moved back to March 8, 1983 because of this legal action.

The Agreement provided for an immediate purchase on February 24 of 11,230 shares at 9.00 per share as follows:

| Purchaser | Shares to be Purchased | Purchase Price |
|---|---|---|
| Corporation | 12,900 | $ 116,110 |
| Pension Plan | 62,330 | 560,970 |
| Mr. Baker | 36,000 | 324,000 |
| | 111,230 | $1,001,070 |

The remaining 138,770 shares, which was later amended to 144,670 shares, were subject to a "put and call" arrangement between Mr. Baker only and the Canadian owners. Mr. Baker was given until February 28, 1985 to purchase these remaining shares at prices ranging from $9.00 per share through May 31, 1983 to $11.19 per share on February 28, 1985. Sellers had the right to put all unpurchased shares to Mr. Baker at $11.19 during March, 1985.

One provision of the Agreement was that Mr. Baker immediately had an irrevocable proxy to vote all 138,770 shares, in addition to the 36,000 he was buying from now until March, 1985. The amendment would make it 144,670.

On the last day of the hearing, March 4, 1983, the stock of the Corporation closed at 7⅜.

The plaintiff asserts that Mr. Baker entered into the agreement in order to maintain control of the Corporation and prevent his removal as chairman of the board and chief executive officer. Mr. Baker testified that he had three reasons for arranging the purchase:

1. He was concerned about the threat posed to the Corporation by the Canadian interests;
2. He wanted to continue in the management and control of the Corporation;
3. He thought the purchase was a good investment.

In the eye of the Court, the provision that taints the Agreement is this, which I shall state in its entirety:

"6) *Integrated Offer*—Each of the provisions of this offer is material to the same. In the event that any provision of this offer is unacceptable to you or is impossible of performance, the entire offer is withdrawn." (Plaintiff's Exhibit 6).

Thus, although the offer provided for the Pension Plan and Corporation to purchase 75,230 shares at once, while Michael Baker only had to buy 36,000 now, he would control an additional 144,670 shares which he was not obligated to buy before February 28, 1985. At the same time, the Agreement was "integrated" so that while neither the Corporation nor Pension Plan would benefit from the additional put and call option to Mr. Baker, they were spending now $677,080 to Mr. Baker's $324,000 or twice as much, and could not purchase the Canadians' stock on their own without Mr. Baker having the put and call option and the irrevocable proxies. The effect of the integrated provision, then, is this—

without the participation of the Pension Plan and the Corporation, there is no deal, yet only Mr. Baker benefits from the irrevocable proxy.

Had the board of directors and pension plan trustees had the opportunity to review the entire Agreement and vote on it the Agreement, arguably, might have been proper. In this case the board of directors knew nothing of the Agreement until after it had been mailed to Canada.

## III.

### *Purchase by the Pension Plan*

The Pension Plan trustees passed a resolution on February 9, 1983, authorizing and directing the Investment Manager "to purchase an amount of Company Stock equal to 10% of the value of the Pension Fund in a block transaction at [current market value] from Mr. John Clark and affiliated persons pursuant to Mr. Clark's offer to Michael Baker III." (Plaintiff's Exhibit 8). The words in brackets, "current market value" were, according to the minutes, added on March 1, 1983. A footnote says "*correction made 3/1/83."

The body of the minutes had stated that Mr. Baker had "advised the Pension Plan Committee that the share of Company Stock controlled by Mr. John Clark in Canada have become available at the current market price." The market had closed on February 4, 1983 at 8¾ and no transactions had been reported since. The Corporation's general counsel had advised that the Pension Plan could buy company stock subject to the limitation in federal law that no more than 10% of the Plan's funds could be invested in company stock.

The members of the Pension Plan committee are all directors of the Corporation. Present at the meeting were Frank B. Reese, Jr., Chairman, Richard L. Shaw and Donald E. Wilson, Secretary. Mr. Baker also attended. Messrs. Shaw (who is President of the Corporation) and Wilson testified at the hearing. Mr. Shaw testified that Mr. Baker had not explained the whole deal to the trustees, including the provision about the additional irrevocable proxies for Mr. Baker.

Mr. Wilson also testified that he never saw the letter agreement before it was sent.

Mr. Shaw testified that the purchase price of shares for the Pension Plan would be 8¾ instead of 9, and Mr. Baker testified that he would make up this difference.

## IV.

### *Mr. Baker's Rationale—The Canadian "Threat"*

There were two aspects to the Canadian threat. In 1980, the Canadians had nominated a slate of directors for the Corporation but had not succeeded in electing them. One Peter Cundill, who was one of the Canadian group, according to Mr. Baker, had a reputation as a corporate raider. Mr. Baker testified that the actual value of the Corporation is far in excess of book value, that the main corporate building could be sold for $3 million more than its depreciated value, and that there would be another $3 million available through the Pension Plan if it were liquidated. Mr. Cundill had inquired about the value of the building, and Mr. Baker felt these facts made the Corporation a tempting target for a takeover.

At a special meeting of the Board on May 27, 1982, called at the behest of Mr. Baker, the Board considered and unanimously rejected an offer from Messrs. Clark and Cundill to sell 200,400 shares of stock at $8.50.

The other aspect of the Canadian threat was the possible loss of government security clearance. The Corporation performs a number of government defense contracts.

The government apparently has a rule that it revokes the security clearance of its contractors if foreign ownership in the contractor exceeds 15%. Indeed, on October 26, 1982, the Company was notified by the Department of Defense that it was invalidating the Corporation's security clearance because of the stock owned by the Canadians. The government subsequently re-

stored the Corporation's clearance when the subsidiary of the Corporation holding the government contract and the Corporation agreed that officers and directors of the Corporation who did not personally have security clearance would not have access to classified information in the custody of the subsidiary. (Plaintiff's Exhibit 12).

The Corporation has 891,000 shares of stock outstanding. We note that if the Canadians own 250,000 shares, they own slightly over 28% of the Corporation. If the immediate purchase of the 111,230 shares goes through, the Canadians still hold 138,770 shares or slightly over 15% of the Corporation. When asked about this at the hearing, counsel for Mr. Baker asserted that the irrevocable proxy given to Mr. Baker for those shares served to eliminate the security clearance problem.

We note, however, that even though the Canadians own about 28% now, the Corporation still has the clearance.

In the Schedule 13D form of the Securities and Exchange Commission filed February 16, 1983, in connection with this transaction (Plaintiff's Exhibit 7), Mr. Baker stated, page 6: "Baker is acquiring the shares of Common Stock ... for the purpose of seeking to assure the continuing participation of the Baker Family in the management and control of the Company, as well as for investment purposes."

No mention was made of the Canadian threat.

The plaintiff asserts that the only reason Baker arranged this transaction was to protect his position with the Company.

## V.

### The Purchase by the Corporation

As to the purchase by the Corporation, the Board of Directors never approved this particular transaction. Mr. Baker relies on a resolution of the Board of Directors passed at a meeting on September 15, 1982 for his authority to bind the Corporation to a purchase of 12,900 shares. (Plaintiff's Exhibit 4). That resolution authorized the "proper officers of the corporation" to re-

purchase up to 20,000 shares of the company's stock.

All witnesses who were asked, including Mr. Baker, agreed that this authorization was intended for the convenience of Michael Baker employees who might be seeking to sell their stock and having a difficult time of it because the stock is thinly traded, even though the resolution does not indicate this was its purpose.

When asked by the Court whether it had not occurred to Mr. Baker to seek clarification from the Board as to the resolution, or have the Board verify that this was valid authority for the purchase pursuant to the Agreement, Mr. Baker said it had not.

## VI.

### Conclusion as to Facts

We have an integrated agreement binding the Pension Plan to purchase 62,330 shares of stock for $560,070 when the Pension Plan committee never saw the Agreement.

We have an integrated agreement binding the Corporation to purchase 12,900 shares of stock for $116,110 from Canadian shareholders without review of the Agreement by the Board of Directors and assertedly pursuant to a resolution passed in order to assist employees of the Corporation by occasionally buying their stock.

### Conclusions of Law

#### I.

#### Jurisdiction

Mr. Dimond's complaint alleges various violations of ERISA. Section 502 of ERISA, 29 U.S.C. § 1132(e)(1), provides that the United States district courts shall have exclusive jurisdiction over any civil action brought under ERISA. Thus, we have jurisdiction to decide the issues in this case.

#### II.

#### Fiduciary Duties—Section 404 of ERISA

Mr. Dimond alleges that, if the sale is consummated, the fiduciary duties as set

forth in Section 404(a)(1)(A), (B) and (C) of ERISA, 29 U.S.C. § 1104 will be violated.

Before we discuss the merits of this claim, we must address the defendants' argument that the plaintiff has not shown that any of the named defendants are fiduciaries or owe any fiduciary duties to the plaintiff, and that, therefore, the claim must be dismissed. We agree that none of the named defendants are fiduciaries under ERISA as defined by 29 U.S.C. § 1002. However, we do not agree that the claim should be dismissed. Under Rule 19(a) of the Rules of Civil Procedure a person who is subject to service of process and whose joinder will not deprive the court of jurisdiction shall be joined if complete relief cannot be accorded in his absence. The Rule further provides that "[i]f he has not been so joined, the court shall order that he be made a party."

██ In the case, *sub judice*, it is clear that Messrs. Shaw, Reese and Wilson, the trustees and fiduciaries of the Plan should be joined as defendants in this action. All three men are subject to service of process and, if joined, will not cause us to be deprived of jurisdiction. Furthermore, any injunction which may be asserted against the Plan, in this case, would necessarily require that for complete relief the trustees also be enjoined. Since all of the elements of Fed.R.Civ.P. 19(a) have been met, and since at least two of the trustees, Messrs. Shaw and Wilson, had notice of this action (as evidenced by the fact that they testified during the hearing), we will order that Messrs. Shaw, Wilson and Reese, as Trustees of the Retirement Plan for Employees of Michael Baker Corporation and Affiliates be joined as defendants in this case. We will further order that the plaintiff serve the three trustees with proper service of process.

With the addition of the Trustees as defendants, we now turn our attention to the plaintiff's claim arising from Section 404 of ERISA, 29 U.S.C. § 1104.

Mr. Dimond alleges that the Trustees breached their fiduciary duties as estab-

lished by 29 U.S.C. § 1104(a)(1)(A), (B) and (C). These subsections provide:

(a)(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so;

After careful review, we find that, in agreeing to this sale, the Trustees breached the "Exclusive Purpose" Rule as set forth in subsection (A) and the "Prudent Man" Rule as established by (B). We do not, however, find a breach of the diversification rule set forth in subsection (C).

29 U.S.C. § 1104(a)(1)(A) provides that the fiduciaries must discharge their duties for the exclusive purpose of providing benefits to participants and their beneficiaries. In defining "exclusive purpose" the Court in *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir.1982), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982), held that:

Although officers of a corporation who are trustees of its pension plan do not violate their duties as trustees by taking action which, after *careful and impartial investigation,* they reasonably conclude best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation or, indeed, themselves, their decisions must be made with an *eye single* to

the interests of the participants and beneficiaries.

(Emphasis supplied.) *Id.* at 271.

■ In this case, the Trustees failed to meet the requirement in two ways. First, both Messrs Shaw and Wilson testified that they did not conduct *any* investigation as to this proposed transaction, yet alone a "careful and impartial investigation." Secondly, we find that the decision to purchase these shares on behalf of the Plan was not done with an "eye single" to the interests of the participants. The Trustees did not even see the agreement at the time they voted to purchase the stocks, and they relied solely on the words of Mr. Baker without seeking any independent advice as to whether this purchase would provide benefits to the participants. Had they carefully reviewed the agreement before voting to accept it, the trustees most certainly would have seen that the sale might not benefit the plan participants. Because this is an integrated offer, the Plan will help Mr. Baker gain control over approximately 180,000 shares. As a result, it is conceivable that Mr. Baker will be able to block any Plan's proposals or, successfully vote against any proposal which the Plan supports all because the Plan helped Mr. Baker gain such power. This could not have been agreed to with an "eye single" to the interests of the participants and their beneficiaries.

These actions on the part of the trustees also resulted in a breach of the prudent man duty as set forth in 29 U.S.C. § 1104(a)(1)(B). As a fiduciary, a trustee must act with the "care, skill, prudence, and diligence" of a prudent man. Messrs. Shaw, Wilson and Reese did not act in such a manner. A prudent man would have asked to see the agreement, would have carefully reviewed the agreement and its consequences, would have conducted an independent investigation and would have sought independent investment advice. None of this was done. Messrs. Shaw and Wilson testified that no such actions were taken because they believed, in their own minds, that it was a wise investment. We

will not attempt to second guess their judgment as to whether or not the purchase of 62,330 shares of Corporation stock at 8¾ is a wise investment. However, we do believe that this purchase, in the context of the precise terms of this agreement, is not wise, and a prudent man would so find.

■ As for whether the subsection (C) duty to diversify was breached, we believe that, even if these stocks were purchased, the Plan would only own Corporation stock having an aggregate fair market value not exceeding 10% of the fair market value of the Plan assets. Section 407(a)(3), 29 U.S.C. § 1107(a)(3). In view of the total unencumbered assets of the Pension Plan, holding an additional 62,330 shares of stock is not necessarily unwise. Even though the Corporation stock value has dropped, a prudent man might see potential in such an investment. Thus, we hold that the trustees would not breach their duty to diversify if the sale is consummated.

### III.

*Prohibited Transaction—29 U.S.C. § 1106(a)(1)(D)*

■ Mr. Dimond alleges that this sale must be stopped because it is a prohibited transaction as set forth in Section 406 of ERISA, 29 U.S.C. § 1106(a)(1)(D).

This section provides in part that:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

\* \* \* \* \* \*

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; ...

In the case *sub judice*, part of the agreement was that the provisions of the offer were integrated. The entire offer is withdrawn if any one of the provisions is unacceptable. (Plaintiff's Exhibit 6). The purchase by the Plan of 62,330 shares with plan assets is necessary for Mr. Baker (a party in interest as defined by 29 U.S.C.

§ 1002(14)) to be able to purchase 36,000 shares and receive an irrevocable proxy on 144,670 shares. Thus, this transaction, on the part of the Plan, would result in the use of plan assets to benefit Mr. Baker, a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D). Though Messrs. Shaw and Wilson testified that they were unaware of this aspect of the agreement, they should have known, as stated in § 1106(a)(1), since they should have inspected the complete agreement as drafted by counsel.

The defendants argue that this agreement is not a prohibited transaction under 29 U.S.C. § 1108(e) since this acquisition of employer stock is for adequate consideration, no commission is being charged, and the purchase will not exceed the 10% limit. It is true that there is no commission and that the 10% limit will be met, however, it is not true that the consideration is adequate. The defendants argue that the Plan will pay 8¾ for each share and that this is adequate since the book value for the stock is $9.35. It may be true that the amount, or legal detriment, is adequate legally to sustain a contract in the abstract, however, the consideration, at any amount, is not adequate since the legal detriment was not *bargained for* as required under basic contract law. *See* Calamari and Perillo, Contracts (2d ed.), pp. 134–35.

In defining "bargained for," the Restatement (Second) of Contracts § 71, Comment b (1981) provides:

b. "Bargained for." In the typical bargain, the consideration and the promise bear a reciprocal relation of motive or inducement: the consideration induces the making of the promise and the promise induces the furnishing of the consideration.

In the case at hand, in bringing the offer to the trustees to purchase the stocks, Mr. Baker did not inform them of the complete bargain. That is, he did not tell them that it was an integrated agreement and that he would receive an irrevocable proxy of the 144,670 shares. The trustees' promise to pay 8¾ for 62,330 shares was not properly induced since the trustees were not aware

of the complete agreement. Thus, the consideration was not bargained for, making it inadequate. As a result, the transaction did not fall within one of the exemptions and it remains prohibited.

## IV.

### The Corporation

Mr. Dimond seeks to enjoin the Corporation from purchasing 12,900 shares of corporation stock as set forth in the agreement. We agree that such a purchase would be invalid.

On September 15, 1982, the Board of Directors passed a resolution giving Mr. Baker the authority to repurchase up to 20,000 shares of the company's stock. As we had previously mentioned, this authority was to repurchase corporation stock from employees as a convenience for them so as to avoid brokerage fees and because the stock is thinly traded. The authority given to Mr. Baker on September 15, 1982 did not cover the purchase in question. Mr. Baker lacked the authority on behalf of the Corporation to enter into this agreement. Thus, the promise to purchase 12,900 shares by the Corporation is invalid.

## V.

### Standard for Granting Preliminary Injunction

Mr. Dimond is seeking a preliminary injunction as to the Corporation, the Plan and Mr. Baker to prevent this sale of stock which is scheduled to close March 8, 1983.

Before a preliminary injunction may be granted, the moving party must demonstrate a reasonable probability of success in the litigation and irreparable harm if relief is not granted. *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982). In order to show irreparable harm, the plaintiff must make a "clear showing of immediate irreparable injury." *Ammond v. McGahn*, 532 F.2d 325, 329 (3d Cir.1976). Furthermore, in order to be irreparable, an injury must be of such a nature that it cannot be compensated by

**900**

money damages. *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974).

We believe that the plaintiff has a great probability of success on the merits. After a day and a half of testimony, we are certain that facts have shown a violation of ERISA and basic corporation and contract law.

As for whether or not the harm is irreparable, we hold that, if the sale were permitted to close at the scheduled time, three specific immediate, irreparable injuries would result. First, the stock of the Corporation would not be readily marketable. Secondly, the ultimate damage to the Plan from diverting other assets into Corporation stock cannot be ascertained. Thirdly, and most importantly, no money damages could compensate for the unlawful voting at the annual meeting of shareholders stock acquired through this sale.

### VI.

#### Conclusion

As a result of the aforementioned Findings of Fact and Conclusions of Law, we will order that a preliminary injunction be issued against Michael Baker III and Michael Baker Corporation and that the Corporation be enjoined from purchasing 12,900 shares from Mr. Clark and that Mr. Baker be enjoined from making any contracts to purchase stock on behalf of the Corporation without obtaining the proper authority from the Board of Directors.

As for the Plan and the Trustees, since the trustees have just been joined as defendants and thus, were not represented at the hearing, we will order that a Temporary Restraining Order be issued against the Plan and the Trustees enjoining them from purchasing 62,330 shares from Mr. Clark as set forth in the Agreement. The Plan and the Trustees will have until Monday, March 14, 1983 to show cause why a preliminary injunction should not be issued against them.

An appropriate order will follow.