**Charles W. LEIGH and Ervin F. Dusek, etc., Plaintiffs-Appellants,**

**and**

**George Johnson, et al., Intervening Plaintiffs-Appellants,**

**v.**

**Clyde William ENGLE, et al., Defendants-Appellees.**

No. 82–2943, 82–3040.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1983.

Decided Jan. 27, 1984.

As Modified On Denial of Rehearing and Rehearing In Banc March 20, 1984.

& Austin, of counsel, Chicago, Ill., for plaintiffs-appellants.

Richard C. Moenning, Chicago, Ill., for intervening plaintiffs-appellants.

Morton Denlow, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for defendants-appellees.

Francis X. Lilly, Deputy Solicitor, Robert N. Eccles, Acting Associate Solicitor, Norman P. Goldberg, Counsel for Fiduciary Litigation, Marc I. Machiz, Asst. Counsel, Thomas L. Holzman, Atty., U.S. Dept. of Labor, Washington, D.C., amicus curiae.

Before WOOD and CUDAHY, Circuit Judges, and GRANT, Senior District Judge.*

CUDAHY, Circuit Judge.

Plaintiffs in this case are beneficiaries of an employee benefit plan who alleged that the plan administrators and others had violated fiduciary duty provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"). The heart of the case is a dispute over how ERISA governs the actions of plan administrators and other fiduciaries with respect to investment activities in contests for corporate control. The beneficiaries allege that the plan administrators and other defendants violated ERISA when they used plan assets to purchase stocks of companies that were targets of the defendants' investment program. After a bench trial, the district court entered judgment for the defendants. We vacate and remand.

## I.

Plaintiffs-appellants are beneficiaries of the Reliable Manufacturing Corporation Employees Profit Sharing Trust ("Reliable Trust"). This action was originally filed by Charles W. Leigh and Ervin F. Dusek; they are beneficiaries of the Reliable Trust and former owners of the Reliable Manufacturing Corporation ("Reliable Manufactur-

Ware Adams, Chicago, Ill., David P. List, Eugene A. Schoon, James R. Stinson, Sidley

---

* Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is     sitting by designation.

ing"). Intervening plaintiffs are a class of all other Reliable Trust beneficiaries who have fully vested rights in the trust.

The Reliable Trust was created by Reliable Manufacturing in 1968 as an employees' profit sharing trust; the trust administrators were appointed by the Reliable Manufacturing board of directors. The Reliable Trust is subject to ERISA, and plaintiffs allege that the defendants-appellees violated their fiduciary duties under ERISA in a series of investments the Reliable Trust made in the spring of 1978. Until March 1978, the trust held all of its assets in the form of fixed income money market investments. In late March 1978, the trust invested approximately 30% of its assets in the stock of three companies: Berkeley Bio Medical, Inc. ("Berkeley"), Outdoor Sports Industries, Inc. ("OSI"), and the Hickory Furniture Company ("Hickory"). Both before and after the trust's purchases, other defendants made sizable investments in the same companies. Plaintiffs allege that the investment of approximately 30% of the Reliable Trust's assets in these three companies was done to aid the defendants who hoped either to win control of the companies or to earn substantial "control premiums."

Defendants-appellees are a group of individuals and business entities with close connections to defendant Clyde W. Engle. The complex network of legal and financial relationships among the defendants is central to our disposition of this case, so we must trace them in some detail. Although defendants dispute the characterization, we will on occasion refer to them as the "Engle group."

### A.

Clyde Engle stands at the center of the network. He is an Illinois financier and investor with numerous business interests.[1] Since 1976 Engle has been chairman of defendant Libco Corporation. In the spring of 1978, Engle owned 31.5% of Libco shares and through trusts for his children controlled an additional 6.4% of Libco. Supplemental Appendix at 496. He also had some degree of control over an additional 12% of Libco shares owned by the Sierra Capital Group, described below. Clyde Engle's offices are at Suite 1600, 625 North Michigan Avenue, Chicago, Illinois.

Defendant Libco Corporation is a holding company which purchased 100% of the common stock of Reliable Manufacturing from plaintiffs Leigh and Dusek in April 1977.[2] Libco also has offices at Suite 1600, 625 North Michigan Avenue in Chicago. In the spring of 1978, Libco owned 64% of the stock of defendant Telco Marketing Services, Inc. ("Telco"). At that time, Clyde Engle was chairman of the board, chief executive officer and treasurer of Telco. Telco's offices are also at Suite 1600, 625 North Michigan Avenue in Chicago.

Defendant Telvest, Inc. ("Telvest") is a wholly owned subsidiary of Telco formed on June 1, 1978, for investment purposes. Engle was president, treasurer and a director of Telvest in 1978. Telvest's offices are also located at Suite 1600, 625 North Michigan Avenue in Chicago.

Two other Engle businesses are not parties to this lawsuit, but their investments in Berkeley, OSI and Hickory in 1978 are relevant to the dispute here. First, GSC Enterprises, Inc. ("GSC") is a holding company

---

1. Other business activities of Engle and other defendants are described in several reported federal decisions. *See, e.g., Telvest, Inc. v. Bradshaw,* 697 F.2d 576 (4th Cir.1983); *Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278 (N.D. Ill.1981); *Telvest, Inc. v. Wisconsin Real Estate Investment Trust,* 489 F.Supp. 250 (E.D.Wis. 1980); *Securities and Exchange Comm'n v. GSC Enterprises, Inc.,* 469 F.Supp. 907 (N.D.Ill. 1979). The investments in this case have also spawned other litigation. *See, e.g., Outdoor Sports Industries, Inc. v. Telvest, Inc.,* 88 F.R.D. 44 (N.D.Ill.1980); *Libco Corp. v. Adams,* 100

Ill.App.3d 314, 55 Ill.Dec. 805, 426 N.E.2d 1130 (1981) (defamation suit against plaintiffs' attorney in this case).

2. Reliable Manufacturing went into involuntary bankruptcy proceedings in March 1979 and was declared bankrupt on December 6, 1979. The sale of Reliable Manufacturing and the subsequent bankruptcy proceedings are described in *In re Reliable Manufacturing Corp.,* 703 F.2d 996, 998–99 (7th Cir.1983).

which owns the Bank of Lincolnwood. In 1978 Engle was chairman of the board and president of GSC, as well as chairman of the board of the bank. GSC's offices are also located at Suite 1600, 625 North Michigan Avenue, Chicago. Second, the Sierra Capital Group ("Sierra") is an Illinois limited partnership engaged in investment activities. The general partner in Sierra is Sierra Associates, another Illinois limited partnership. Clyde Engle is one of two general partners of Sierra Associates. In the spring of 1978, among its other investments, Sierra owned 12% of Libco stock and 19% of GSC stock. Sierra's offices are also at Suite 1600, 625 North Michigan Avenue in Chicago.

Defendant Nathaniel Dardick is an attorney who played key roles in all of the organizations described above. Dardick graduated from the University of Chicago Law School in 1974. He was associated for several years with the Chicago firm of Sachnoff Schrager Jones Weaver & Rubenstein, which did work for Clyde Engle.[3] He then established his own firm with offices at Suite 1600, 625 North Michigan Avenue in Chicago. During 1978 and 1979, Dardick was retained as personal counsel to Clyde Engle. He was also general counsel to Libco, Telco, Telvest, GSC, the Bank of Lincolnwood and Sierra. The record does not show clearly whether Dardick had other clients in 1978 and 1979, but it is clear that Engle and these organizations accounted for most of Dardick's income from his law practice.[4] Dardick is also one of two administrators of the Reliable Trust, and he had direct control over the trust's investments in 1978 and 1979.

Defendant Ronald Zuckerman was president of Reliable Manufacturing and a member of the Reliable Manufacturing board of directors in 1977 and 1978. However, he received no salary from Reliable Manufacturing. He was paid only as a member of the Libco board and as an investment consultant to Libco. Zuckerman was also the other administrator of the Reliable Trust. He and Dardick were appointed administrators in September 1977 by the Reliable Manufacturing board of directors, composed of Engle, George Contarsy and Zuckerman himself. (Engle, Contarsy and Zuckerman were also directors of Libco.) Neither Dardick nor Zuckerman received compensation as trust administrators. Zuckerman's offices are also at Suite 1600, 625 North Michigan Avenue in Chicago.

Charles Newbill was originally named as a defendant in the case, but he was never served with the complaint. His role in the case is central, for he was the investment analyst who identified the investment opportunities for Dardick and the Reliable Trust, as well as for Engle, Libco, Telco, Telvest, Sierra and GSC. Newbill first met Engle when both worked at the Harris Bank in Chicago. Newbill was also a general partner in Sierra Associates between 1970 and 1972, and he worked abroad briefly. Newbill went to work for Libco and Engle as an investment consultant in 1976. During 1977 and part of 1978, Libco was Newbill's only paying client.[5] According to Newbill's testimony, he sought financial information from several thousand companies, analyzed their replies to look for undervalued companies, and identified thirty companies which he thought had good investment potential for Libco. During the early months of 1978, Newbill talked with both Engle and Dardick about his research, and he narrowed the list of investment targets. To both Engle and Dardick, he recommended investments in Berkeley Bio Medical, Inc. ("Berkeley"), Hickory Furniture Company ("Hickory"), and Outdoor Sports Industries, Inc. ("OSI"). Newbill's

---

**3.** The firm of Sachnoff Weaver & Rubenstein has represented all defendants in this lawsuit at trial and on appeal.

**4.** *See* Supplemental Appendix at 294–304.

**5.** Newbill submitted a bill to the Reliable Trust for investment advice given in early 1978, but the bill was not prepared until December 1978, several months after this litigation was filed to challenge the investments Newbill recommended. To the extent that Newbill provided investment counseling to the Reliable Trust, he may be considered a fiduciary of the trust. *See* 29 U.S.C. § 1002(21)(A)(ii).

office was also at Suite 1600, 625 North Michigan Avenue in Chicago.

Defendant National Boulevard Bank is now trustee of the Reliable Trust. The bank became trustee on February 5, 1979, after the challenged investments were made but while the trust still held its shares of OSI and Hickory. The bank is a defendant because all plaintiffs seek an immediate distribution of the assets remaining in the trust.

### B.

Plaintiffs' claim here depends upon the relationships between the Reliable Trust's investments in Berkeley, OSI and Hickory, and the activities of other members of the Engle group. Therefore we must examine the activities in considerable detail.

The Engle group's investment and acquisition plans for Berkeley, Hickory and OSI appear in the records of a meeting of the Telco board of directors on April 21, 1978. Supplemental Appendix at 424–29. The meeting was held at Suite 1600, 625 North Michigan Avenue in Chicago. Engle chaired the meeting and Dardick acted as secretary.[6] Engle informed the board that Telco had approximately $2,000,000 available for investment, and he recommended that Telco invest the money in up to 10% of the outstanding shares of Berkeley, Hickory and OSI. Newbill presented to the board his analysis of the three companies. The minutes of the meeting show that the Telco board learned that members of the group had already begun to establish positions in each of the three companies:

> As part of these discussions, the Board was also advised of the ownership positions in such companies of certain affiliates of the Company and associates of certain directors of the Company, namely Libco Corporation, GSC Enterprises, Inc., Clyde Wm. Engle, Sierra Capital Group,

Ronald K. Zuckerman *and the Reliable Manufacturing Corporation Employees' Profit Sharing Trust.* In particular, it was disclosed that the following persons own shares of Berkeley, Hickory and OSI in the amounts set opposite their respective names as follows:

|  | Berkeley | Hickory | OSI |
|---|---|---|---|
| Libco Corporation | | 47,000 | |
| Clyde Wm. Engle | 41,670 | | 3,500 |
| GSC Enterprises, Inc. | 32,100 | 4,000 | 8,000 |
| Ronald K. Zuckerman | 1,200 | | |
| Sierra Capital Group | 21,600 | | |
| *Reliable Profit-Sharing Trust* | *15,000* | *8,000* | *12,500* |

Supplemental Appendix at 426 (emphasis supplied). At the time of the April 21st meeting, the various members of the Engle group, including Telco,[7] owned approximately 5.58% of outstanding Berkeley shares, 2.98% of outstanding OSI shares and 4.88% of outstanding Hickory shares. Short Appendix at 29–33. The Telco board adopted a resolution authorizing management to purchase approximately 10% of the outstanding shares of the three companies, but the resolution also put ceiling prices on the purchases. The resolution authorized Telco to consolidate the group's holdings by purchasing shares owned by Sierra, Engle, Libco and GSC. Supplemental Appendix at 427. After the April 21st meeting, virtually all of the group's further purchases of the three stocks were made by Telco or by its subsidiary, Telvest, formed in June 1978.

Thus, during 1978 when the Reliable Trust invested 30% of its assets in Berkeley, OSI and Hickory, other members of the Engle group were purchasing substantial amounts of stock in the three companies both before and after the trust purchases.[8] Plaintiffs contend that the Engle group purchases and the trust's purchases were part of a concerted investment and acquisition program by Engle and his associates.

---

6. Zuckerman did not attend the meeting.

7. Telco began to purchase Berkeley and OSI shares on April 17, 1978.

8. The appellants have not pressed in this court their claims regarding trust investments in oth-

er securities, including Bank of Lincolnwood capital notes and Joseph Dixon Crucible Company common stock. Therefore, we have not considered the district court's findings with respect to those investments.

They allege that the trust's assets were invested to enhance the Engle group's position with respect to control of the three target companies.

There is no claim here that the Reliable Trust lost any money through the disputed investments. Indeed, the trust profited handsomely from its investments in Berkeley and OSI.[9] Instead, plaintiffs here claim that the trust's assets were put at risk to benefit the Engle group in its program of acquisitions.[10]

1. *Berkeley investments:* The Engle group's interest in Berkeley began in early 1978, when Berkeley was the target of an unfriendly takeover attempt by Cooper Laboratories, Inc. ("Cooper"). Berkeley president Irving Abramowitz asked Engle to help him defend against the takeover, and Engle purchased more than 60,000 shares of Berkeley stock for himself and GSC in January 1978. By the beginning of March, Sierra and Zuckerman had also purchased Berkeley shares, and the holdings of Engle, GSC, Sierra and Zuckerman amounted to approximately 3.6% of Berkeley shares.

In late February, Engle learned that Abramowitz and Cooper were planning a deal to settle their control contest. Berkeley management planned to give Cooper control of Berkeley's medical equipment subsidiary in return for Cooper's shares of Berkeley. The deal would have kept Abramowitz in control of Berkeley. Engle thought the proposed deal would be disadvantageous to minority shareholders such as himself. Supplemental Appendix at 554–61. Plaintiffs contend that Engle was "locked in" as a minority shareholder under hostile management, and that he sought to escape his position by increasing his control of the company. Engle bought an additional 11,200 shares of Berkeley for himself and GSC between February 27th and March 10th.

Between March 17, 1978, and March 31, 1978, the Reliable Trust bought at Dardick's direction 15,800 shares of Berkeley stock at a total cost of $71,580.53. Those 15,800 shares represented approximately 10% of the trust's assets at the time and constituted 0.65% of the outstanding Berkeley shares. Adding the trust's shares to those owned by Engle, Zuckerman, GSC and Sierra, the group owned a total of 4.65% of Berkeley at the end of March 1978.

While the Reliable Trust was buying Berkeley shares on his orders, Dardick was helping Engle respond to the proposed deal between Berkeley and Cooper. On March 22, 1978, Engle sent letters on GSC letterhead to the Berkeley outside directors protesting the proposed deal and arguing that it was contrary to the interests of minority shareholders. He described the transaction as an "improper sweetheart deal." The letters suggested that Engle would take further steps if necessary to protect the interests of minority shareholders. Dardick helped Engle prepare these letters and actually signed Engle's name to them. About two weeks later, Engle, Sierra and GSC

---

**9.** The Reliable Trust's investments in Berkeley, OSI and Hickory may be summarized as follows:

| | Number of Shares | Purchase Price | Sale Price | Profits | Return on Investment |
|---|---|---|---|---|---|
| Berkeley | 15,800 | $ 71,580.53 | $118,500.00 | $ 46,919.47 | 66% |
| OSI | 12,500 | 77,736.83 | 187,500.00 | 109,763.17 | 141% |
| Hickory | 12,000 | 72,433.21 | 75,000.00 | 2,566.79 | 4% |
| Totals | | $221,750.57 | $381,000.00 | $159,249.43 | 72% |

Profits and return on investment do not include dividends received.

**10.** It is not clear whether the Engle group intended to acquire majority control of Berkeley, OSI or Hickory. The group eventually acquired a majority of Hickory stock, but Hickory management did not oppose the acquisition. Both Berkeley and OSI management resisted the Engle group's acquisition efforts, and the Engle group succeeded in acquiring only 10.7% and 22% of the two companies respectively. The Reliable Trust made substantial profits on its Berkeley and OSI investments, yet made

filed suit to enjoin consummation of the deal between Berkeley and Cooper.[11] Dardick acted as their attorney in the suit. Thus, at the same time Dardick was investing 10% of the Reliable Trust's assets in Berkeley stock, he and Engle were arguing that Berkeley management was acting contrary to the interests of minority shareholders such as the Reliable Trust.

In April Telco began to purchase Berkeley shares, and by August the Engle group owned 10.72% of Berkeley stock. The litigation initiated by Engle and his associates to enjoin the Berkeley-Cooper deal was settled in August 1978 by having Cooper buy the Berkeley shares controlled by the Engle group for a very profitable price. The Reliable Trust was not a party to the lawsuit, nor were trust funds used in the litigation. However, the trust's shares were included in the settlement.[12]

2. *OSI investments:* In March 1978, the Reliable Trust and GSC began purchasing OSI stock. By the end of March, the trust owned 12,400 shares and GSC owned 5,100 shares, totalling 1.22% of the outstanding OSI shares. The trust had spent $77,736.83 for its shares of OSI. At the time of the April 21st Telco board meeting, GSC, Engle, Telco and the Reliable Trust owned 42,800 shares of OSI, or approximately 2.98% of the outstanding shares. Telco and later Telvest continued to purchase OSI stock steadily until March 1979, when the group's holdings were 312,400 shares, or 21.73% of outstanding shares. On May 3, 1978, Engle and Newbill visited OSI management and asked that Engle be put on the OSI board, but the proposal was rejected. A few days

later, Telco and Libco filed with the Securities and Exchange Commission a Schedule 13D revealing the Engle group's purchases of OSI stock and their intentions to acquire more shares. The Schedule 13D said "Libco may be deemed to own beneficially an additional 12,500 shares of OSI owned of record by the Reliable Manufacturing Corporation Employees Profit Sharing Trust ('Reliable Trust')," and it stated that Libco could elect the directors of Reliable who in turn appointed the Reliable Trust administrators. The statement also noted that Zuckerman was a director of both Libco and Reliable, president of Reliable and one of the Reliable Trust administrators. In the Schedule 13D, Libco expressly disclaimed "any beneficial interest in the assets of the Reliable Trust." [13]

In early 1979 the Engle group battled OSI management for control of the company through two tender offers and a proxy fight. Documents filed in the tender offers continued to show the relationship between the Reliable Trust and other group members. Dardick acted as attorney for Telco in the tender offers and for Telvest in the proxy fight. During the proxy fight, Dardick ordered the Harris Bank as trustee to vote the trust's shares in favor of the Telvest slate of directors on April 24, 1979. During these struggles, Dardick was sharply critical of OSI management and the company's profitability. At the same time, Dardick controlled the Reliable Trust's investments in OSI, and his statements indicate that he believed the investments could have turned out well only if OSI management could have been replaced, or if the

very little profit on the Hickory investments. *See supra* note 9.

11. Telco, Libco, Engle and Sierra filed a Schedule 13D with the Securities and Exchange Commission in April 1978 regarding their purchases of Berkeley stock. In the list of Berkeley shares held by the reporting persons and their associates, the Reliable Trust shares of Berkeley were included. Their inclusion in the list is by no means conclusive as to whether the trust shares were "used by" the Engle group. However, the inclusion of the Reliable Trust's holdings in the SEC filing is clear evidence that the reporting persons—Engle, Libco, Telco and Si-

erra—knew of the trust's Berkeley investments.

12. Defendants apparently contend that this inclusion of the Reliable Trust shares in the settlement was a generous act to benefit the trust. Brief of Defendants at 37.

13. Neither the mention of the trust's shares nor the disclaimer is conclusive regarding the use of the trust's assets. However, the filing is clear evidence that Libco, Telco and Engle (who signed the filing for Telco) knew of the trust's investments in OSI. *See supra* note 11.

trust could have sold its shares to a "white knight" for a premium.

By May 1979, the Engle group controlled 21.73% of OSI shares. The control contest ended when the Brown Group, Inc., entered as a "white knight" on behalf of OSI management and tendered $15.00 per share of OSI stock. On June 26, 1979, the Reliable Trust sold its OSI shares to the Brown Group for a profit of 141%.

3. *Hickory Furniture investments:* Hickory was the third investment target, and the Engle group succeeded in purchasing a majority of Hickory stock by October 1979. The Reliable Trust bought 8000 shares of Hickory on March 22, 1978. At that time, Libco and GSC already owned 50,400 shares, and the trust purchases gave the group 4.88% of outstanding Hickory stock. After the April 21st Telco meeting, Telco and later Telvest steadily acquired Hickory stock.[14] The Reliable Trust purchased an additional 4000 shares of Hickory on June 9, 1978. Hickory management did not resist the Engle group investments, and on June 28th, Engle became a member of the Hickory board of directors. By the end of 1978, the Engle group owned 32.8% of Hickory, and their holdings grew to 52.8% in October 1979. The Reliable Trust sold its 12,000 shares of Hickory on March 19, 1979, one year after its initial purchase, for a net profit of 4%.

### C.

The case before us was tried in the district court before Judge Leighton in September 1982. The district court granted judgment for defendants in an unpublished memorandum issued November 18, 1982. The district court held first that ERISA does not create a cause of action where the plan does not suffer financial loss. Conclu-

sion of Law No. 10. The district court also found that the defendants did not use the Reliable Trust assets for their own purposes and that the assets were used exclusively in the interest of the trust beneficiaries. Findings of Fact Nos. 11, 12, 13 and 18; Conclusions of Law Nos. 4 and 15. The district court held that Dardick, Zuckerman and the National Boulevard Bank were fiduciaries of the trust, but that they had not violated their duties under ERISA sections 404 and 406, 29 U.S.C. §§ 1104 and 1106, by investing the trust assets in Berkeley, OSI and Hickory. Conclusions of Law Nos. 2, 4, 5, 6 and 15. The court concluded that the plan assets had been used for the exclusive benefit of the plan beneficiaries, Conclusion of Law No. 15, and that the plan administrators acted in good faith, Finding of Fact No. 23. The court also concluded that Dardick, Zuckerman and the National Boulevard Bank did not breach their co-fiduciary obligations under 29 U.S.C. § 1105(a). The court held further that Engle, Libco, Telco and Telvest had not exercised discretionary authority over the Reliable Trust and were not fiduciaries with respect to the investment or administration of its assets. Findings of Fact Nos. 21 and 22; Conclusion of Law No. 7. The court awarded expenses and attorneys' fees to all defendants and held that Dardick, Zuckerman and the National Boulevard Bank were entitled to reimbursement of expenses and fees from the trust's remaining assets. Conclusion of Law No. 16.

### II.

The Reliable Trust's investments in Berkeley, OSI and Hickory produced in the aggregate the extraordinary return on investment of 72%, exclusive of dividends.[15] It is clear that the trust lost no money in

---

14. Libco and Telco filed a Schedule 13D with the Securities and Exchange Commission in May 1978 regarding their purchases of Hickory stock. Later filings to update the original Schedule 13D describe the Reliable Trust's holdings of Hickory stock and say that "Libco may be deemed to own beneficially" the trust's shares. Libco also disclaimed "any beneficial interest in the assets of the Reliable Trust." Again, the statements in the SEC filings are not

conclusive as to whether the Engle group used the Reliable Trust's assets in its acquisition program. *See supra* notes 11 and 13. Nevertheless, the filings clearly show that Telco, Libco and Engle were aware of the Reliable Trust's Hickory investments.

15. See *supra* note 9.

the challenged transactions. The district court held that ERISA creates no cause of action where a breach of fiduciary duty does not cause financial harm to the benefit plan, Conclusion of Law No. 10, but the district court erred in this statement of the law. ERISA clearly contemplates actions against fiduciaries who profit by using trust assets, even where the plan beneficiaries do not suffer direct financial loss.[16] A fiduciary who breaches his duties "shall be personally liable ... to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a).

The nature of the breach of fiduciary duty alleged here is not the *loss* of plan assets but instead the *risking* of the trust's assets at least in part to aid the defendants in their acquisition program. ERISA expressly prohibits the use of assets for purposes other than the best interests of the beneficiaries, and the language of section 1109(a) providing for disgorgement of profits from improper use of trust assets is the appropriate remedy.[17] On the record before

us, we are unable to determine the extent of the defendants' total profits, and we certainly cannot measure the extent, if any, to which any profits resulted from the defendants' use of the trust assets. However, those questions are relevant only in measuring damages. *See infra* Part VI. At this point in the analysis, we need only say that plaintiffs are not required to show that the trust lost money as a result of the alleged breaches of fiduciary duties. If ERISA fiduciaries breach their duties by risking trust assets for their own purposes, beneficiaries may recover the fiduciaries' profits made by misuse of the plan's assets.

### III.

ERISA requires those who control employee benefit plans to act solely in the interests of the plan beneficiaries. The fiduciary duties of those who control benefit plans are set forth in part 4 of Title I of ERISA. Two sections are applicable to this case. First, section 404(a), 29 U.S.C. § 1104(a), codifies and makes applicable to fiduciaries [18] certain principles developed in

16. The district court's reliance on *Alton Memorial Hospital v. Metropolitan Life Ins. Co.,* 656 F.2d 245, 249 (7th Cir.1981), is misplaced. That case involved a contractual dispute between an employer who maintained a pension plan and the enrolled actuary of the plan. This court there held that the actuary could not invoke ERISA's fiduciary standards to recover from the employer in the contractual dispute between them. It was clear that the interests of the plan beneficiaries were not affected in any way, and thus ERISA did not create a cause of action on behalf of the actuary. In the present case, by contrast, the interests of plan beneficiaries were directly affected. The defendants appear to have risked the trust assets in part to serve their own purposes rather than solely the interests of the beneficiaries. With its focus on protecting the interests of plan beneficiaries, ERISA clearly prohibits such actions, and the provisions in section 1109(a) for disgorgement of profits are the remedy to deter such violations.

17. The legislative history of ERISA shows that Congress intended disgorgement of profits to be one remedy available for breach of fiduciary duty. A fiduciary who breaches this duty "must restore to the plan any profits which he made using plan assets." S.Rep. No. 383, 93rd Cong., 1st Sess. 105, *reprinted in* 1974 U.S.Code Cong. & Ad.News 4890, 4988. The disgorgement

provisions of § 1109(a) are in accord with the common law of trusts. *See* Restatement (Second) Of Trusts § 205(b), comment (h), and § 206 comment (j) (1959). *See also Home Federal Savings & Loan Ass'n v. Zarkin,* 89 Ill.2d 232, 59 Ill.Dec. 897, 432 N.E.2d 841, 848 (1982). The purpose of this strict rule is to deter breaches by denying fiduciaries any profits from their misuse of assets. G. Bogert, The Law Of Trusts And Trustees § 543 at 218 (rev. 2d ed. 1978).

18. "Fiduciary" is defined in ERISA as follows:
      (A) Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.
    29 U.S.C. § 1002(21)(A). We discuss below the application of this definition to the defendants in this case.

the law of trusts.[19]  H.R.Rep. No. 533, 93rd Cong., 1st Sess. 11, 13, *reprinted in* 1974 U.S. CODE CONG. & AD.NEWS 4639, 4649, 4651.  Section 404(a)(1) provides in relevant part that:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries;  and
> >
> > (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. § 1104(a)(1).  For the case before us, the key provisions are those requiring the fiduciary to act "solely in the interest" of plan beneficiaries and for "the exclusive purpose" of providing benefits.  Other federal courts have described the duty of loyalty under ERISA as the duty to act with "complete and undivided loyalty to the beneficiaries of the trust," *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 639 (W.D. Wis.1979), and with an "eye single to the interests of the participants and beneficiaries," *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

Second, section 406 of ERISA, 29 U.S.C. § 1106, prohibits transactions in which the potential for misuse of plan assets is particularly great.  The prohibited transaction rules focus primarily on the relationship between the benefit plan and other parties to a transaction, and the section prohibits transactions where those dealing with the plan may have conflicting interests which could lead to self-dealing.  For example, section 406(a)(1)(B) prohibits loans between benefit plans and parties in interest.  The *per se* rules of section 406 make much simpler the enforcement of ERISA's more general fiduciary obligations.  *See* S.REP. No. 383, 93rd Cong., 1st Sess. 95, *reprinted in* 1974 U.S.CODE CONG. & AD.NEWS 4890, 4979.

Section 406 also includes broader language which may require a more detailed analysis of the fiduciary's actions.  The provisions relevant to this case are:

> (a) Except as provided in section 1108 of this title:
>
> > (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> > \* \* \* \* \* \*
>
> > (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan. . . .
>
> > \* \* \* \* \* \*
>
> (b) A fiduciary with respect to a plan shall not—
>
> > (1) deal with the assets of the plan in his own interest or for his own account . . . .

29 U.S.C. § 1106.  The relevant language here is quite broad:  "use by or for the benefit of, a party in interest," § 1106(a)(1)(D),[20] and "deal . . . in his own interest," § 1106(b)(1).

The district court found that Dardick and Zuckerman did not breach their fiduciary duties under ERISA by purchasing and holding stock in Berkeley, OSI and Hickory.  The court found that the purchases were made upon the advice of Newbill and were

---

**19.**  As one district court has stated:

> The legislative history of the [fiduciary duty] sections of ERISA indicates, that to the extent practical, the obligations of trustees of pension funds and the limitations on their power of investment were to be interpreted under principles applicable to trustees under the common law of trusts, with a view toward establishing uniform standards.

*Marshall v. Teamsters Local 282 Pension Trust Fund,* 458 F.Supp. 986, 990 (E.D.N.Y.1978) (fn. omitted).

**20.**  ERISA defines "party in interest" at 29 U.S.C. § 1002(14).  The definition includes Reliable Manufacturing, Libco, Telco, Telvest, Engle, Zuckerman, Dardick and the National Boulevard Bank.  29 U.S.C. § 1002(14)(A), (B), (C), (E), (G) and (H).

intended to diversify the plan's investments. The court also held that it was not improper for the Reliable Trust to hold its stock in Berkeley, OSI and Hickory after Telco made major purchases of the stocks. The court concluded that the trust's investments were prudent and made exclusively for the benefit of the trust beneficiaries. The court also found that the purchases were not prohibited transactions under section 406. The district court therefore concluded that Dardick and Zuckerman did not breach their fiduciary duties under section 404 and section 406.

■ We must accept the district court's findings of fact unless we find them "clearly erroneous." FED.R.CIV.P. 52(a); *Clark v. Universal Builders, Inc.,* 706 F.2d 204, 206 (7th Cir.1983). In this case, however, many of the district court's most important "Findings of Fact" regarding the use of the trust's assets are mixed findings of fact and law. *See* Findings of Fact Nos. 11, 12, 13, 17, 18, 19, 21, 22. Our review of these findings is consequently less deferential than it might otherwise be. *Harrison v. Indiana Auto Shredders Co.,* 528 F.2d 1107, 1120 (7th Cir.1975). *See Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 262–63 (7th Cir.1981) (review of mixed findings and "paper" cases), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Further, the evidence relevant to our conclusions on the critical issues in this case consists of documents and undisputed oral testimony. The district court's findings on issues where the observation of witnesses is critical are, of course, fully subject to the clearly erroneous rule. However, the district court's findings as to the defendants' credibility and good faith are not relevant to our disposition of this case, and thus we do not decide whether they were clearly erroneous. *See* Finding of Fact No. 23. This litigation concerns the legal significance of undisputed facts—the disputed issues of credibility and subjective good faith simply do not come into play. Good faith is not a defense to an ERISA fiduciary's breach of the duty of loyalty. *See Donovan v. Bierwirth,* 538 F.Supp. 463, 470 (E.D.N.Y. 1981), *aff'd as modified,* 680 F.2d 263 (2d

Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

■ In our view, application of ERISA's fiduciary standards to the Reliable Trust's investments in the corporate control contests here requires us to reverse the judgment below. The undisputed facts in the record show that the district court clearly erred when it concluded that plan assets were used exclusively in the interests of beneficiaries. The Reliable Trust administrators did not act solely in the interests of the plan beneficiaries where they invested the trust's assets in companies involved in corporate control contests, where the administrators themselves were actively engaged in the control contests and had substantial interests in them, where the administrators failed to make an intensive and independent investigation of the investment options open to the trust and where the trust's investment decisions never deviated from the best interests of the Engle group.

A. *Fiduciary Standards of Section 404.* The Second Circuit applied the fiduciary standards of section 404 to fiduciaries' conduct in a contest for corporate control in *Donovan v. Bierwirth,* 680 F.2d 263 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). At issue were the actions of Grumman Corporation's pension fund trustees during the Grumman-LTV takeover battle. The trustees were also Grumman officers. The district court had stated that Grumman corporate insiders with fiduciary duties to the corporation's pension fund would be tested against a standard requiring them to undertake a vigorous and independent investigation into the wisdom of the contemplated investment in order to meet the section 404(a)(1)(B) standards:

> [their] independent investigation into the basis for an investment decision which presents a potential conflict of interests must be both intensive and scrupulous and must be discharged with the greatest degree of care that could be expected under all the circumstances by reasonable beneficiaries and participants of the plan.

*Donovan v. Bierwirth,* 538 F.Supp. 463, 470 (E.D.N.Y.1981), *aff'd as modified,* 680 F.2d 263 (2d Cir.), *cert denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

Writing for the Second Circuit on appeal, Judge Friendly considered two approaches to analyzing the trustees' duty of loyalty in managing plan assets during the takeover battle. The first approach focused on the existence of conflicting interests between the trustees and the plan beneficiaries. The pension trustees were obliged to make their decisions, Judge Friendly wrote, "with an eye single to the interests of the participants and beneficiaries." 680 F.2d at 271. That duty of loyalty imposed upon the trustees a duty "to avoid placing themselves in a position where their acts as officers and directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Id.*[21] Where the plan trustees were officers of the takeover target, and where they clearly had substantial career and financial interests in the outcome of the control contest, the court said it believed it would have been "almost impossible" for the trustees to have decided to use the trust assets in ways which would weaken their own position in the control contest, regardless of the interests of the plan beneficiaries. 680 F.2d at 272. Thus, the first approach the Second Circuit considered would require fiduciaries who face substantial conflicts of interest in corporate control contests to step aside so that a neutral trustee could act for the duration of the control contest. The court approved of this approach, 680 F.2d at 271–72, but chose to rest its decision instead on the second approach which examined in great detail the trustees' investigation of the alternatives open to them. The court held that the trustees' investigations did not amount to the thorough, careful and impartial investigation needed to justify actions which

would, at least incidentally, benefit themselves and their corporation, apart from their effects on the beneficiaries of the trust:

> they should have realized that, since their judgment on this score could scarcely be unbiased, *at the least they were bound to take every feasible precaution to see that they had carefully considered the other side,* to free themselves, if indeed this was humanly possible, from any taint of the quick negative reaction characteristic of targets of hostile tender offers ..., and particularly to consider the huge risks attendant on purchasing additional Grumman shares at a price substantially elevated by the tender offer.

680 F.2d at 276 (emphasis supplied).

Under the section 404(a) duty of loyalty, the central question is whether the fiduciaries acted solely in the interests of the beneficiaries and for the exclusive purpose of providing them with benefits. The two approaches considered in *Donovan v. Bierwirth* offer two avenues for dealing with this central question. The first avenue focuses on the potential for conflicts of interest between the fiduciaries and the plan beneficiaries. Where the potential for conflicts is substantial, it may be virtually impossible for fiduciaries to discharge their duties with an "eye single" to the interests of the beneficiaries, and the fiduciaries may need to step aside, at least temporarily, from the management of assets where they face potentially conflicting interests. The second avenue involves a broader inquiry into the fiduciaries' actions where they may have substantial interests in a control contest. In *Donovan v. Bierwirth,* the Second Circuit focused on the fiduciaries' actions in investigating the investment options open to the plan during the corporate control contest. Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an in-

---

21. We recognize, as did the court in *Donovan v. Bierwirth,* that ERISA contains express exceptions which permit fiduciaries to act in a few limited situations where their interests and those of plan beneficiaries may diverge. *See* 29 U.S.C. § 1108. However, the exceptions of section 1108 are quite limited, and abuses are reasonably easy to detect where, for example, a trustee pays himself an excessive salary. None of the exceptions in section 1108 is applicable here.

tensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries. 538 F.Supp. at 470; 680 F.2d at 272. In the case before us, we believe there is an additional factor which weighs heavily in evaluating the loyalty of the fiduciaries. Here the control efforts lasted for several months, and in the case of Hickory, for over a year. The Reliable Trust held its shares involved in the control contests throughout these periods, and, as we discuss below, the trust's use of its assets at all relevant times tracked the best interests of the Engle group in the control contest. We believe that the extent and duration of these actions congruent with the interests of another party are also relevant for courts in deciding whether plan fiduciaries were acting solely in the interests of plan beneficiaries.

■ B. *Prohibited Transactions Under Section 406.* Before discussing the application of the fiduciary standards to this case, we must also examine the applicability of the prohibited transaction provisions of section 406. In *Donovan v. Bierwirth,* the Second Circuit declined to apply the prohibited transaction provisions of section 406 to that case involving the use of an employee pension plan's assets to defend the employer from a hostile tender offer. 680 F.2d at 270. Specifically, the court there refused to apply the provisions of section 406(b)(2) prohibiting a fiduciary from acting on behalf of a party with interests adverse to the plan or its participants and beneficiaries. The Second Circuit stated that subsection (b)(2) was the only "arguably applicable" provision in section 406. The court said:

> We see no reason to think Congress intended the expansive interpretation of the various specific prohibitions of § 406 urged by the Secretary, particularly in light of the inclusion of the sweeping requirements of prudence and loyalty contained in § 404.

680 F.2d at 270.

However, we believe that the protective provisions of section 406(a)(1)(D) and (b)(1) should be read broadly in light of Congress'

concern with the welfare of plan beneficiaries. We read those provisions dealing with the use of plan assets for the benefit of "parties in interest" and plan fiduciaries as a gloss on the duty of loyalty required by section 404.

We do not believe that Congress intended the language "use by or for the benefit of, a party in interest," § 406(a)(1)(D), and "deal . . . in his own interest," § 406(b)(1), to be interpreted narrowly. The entire statutory scheme of ERISA demonstrates Congress' overriding concern with the protection of plan beneficiaries, and we would be reluctant to construe narrowly any protective provisions of the Act.

The broad provisions of section 406(a)(1)(D) and (b)(1) require courts to look carefully at the transaction to decide whether plan assets were used "by or for the benefit of" a party in interest, or whether a fiduciary dealt with the plan assets "in his own interest." Application of these provisions may require courts to engage in the same searching investigation into the objective circumstances of the fiduciary's actions needed to apply the fiduciary loyalty provisions of section 404(a)(1).

■ Section 406(a)(1)(D) should be read to cover the actions of a trustee who buys shares in a target corporation in order to assist either the target's management or the raider in its quest for corporate control or a "control premium." If the corporation which the fiduciary seeks to aid qualifies as a "party in interest," we see nothing in the language or legislative history of subsection (a)(1)(D) which would preclude a court from treating the purchase as the use of plan assets for the benefit of a party in interest, at least where other evidence shows the fiduciary's purpose. *See Dimond v. Retirement Plan,* 582 F.Supp. 892, 4 EMPLOYEE BEN.CAS. (BNA) 1457, 1463 (W.D.Pa.1983) (enjoining use of plan assets to protect employer's incumbent management). The legislative analysis of subsection (a)(1)(D) clearly anticipates such an application of the subsection:

[Subsection (a)(1)(D) ] prohibits the direct or indirect transfer of any plan income or assets to or for the benefit of a party-in-interest. It also prohibits the use of plan income or assets by or for the benefit of any party-in-interest. As in other situations, *this prohibited transaction may occur even though there has not been a transfer of money or property between the plan and a party-in-interest. For example, securities purchases or sales by a plan to manipulate the price of the security to the advantage of a party-in-interest constitutes [sic] a use by or for the benefit of a party-in-interest of any assets of the plan.*

H.R.CONF.REP. No. 1280, 93rd Cong., 2d Sess. 308, *reprinted in* 1974 U.S.CODE CONG. & AD.NEWS 5038, 5089 (emphasis supplied).

In addition, subsection (b)(1) could be applicable to an administrator's investment activities in the context of a corporate control contest, particularly when the administrator is also an officer of the sponsoring corporation or a closely related entity. Subsection (b)(1) requires that a trustee not deal with the assets of the plan "in his *own* interest." (Emphasis supplied.) *See Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 637 (W.D.Wis.1979) (section 406(b) prohibits fiduciary from acting where personal interests may conflict with plan's interest). The question is how broadly "interest" should be read. While it would surely cover trustee interests of a financial nature, one commentator has argued that courts should not limit the section to financial interests:

> The absence of a direct financial interest in the transaction, however, should not preclude the application of this section to officer-trustees, as the prohibited transaction rules are designed to prevent the use of plan assets for any interest, financial or nonfinancial, other than an interest of the plan and its beneficiaries.

Note, *The Duties of Employee Benefit Plan Trustees Under ERISA in Hostile Tender Offers,* 82 COLUM.L.REV. 1692, 1703 n. 51

(1982). In light of ERISA's broad language and protective provisions, we agree that we should read broadly the term "interest" in section 406(b)(1).[22] Thus, in a contest for corporate control, plan trustees who are also officers of either the "target" or the "raider" could be seen as having a significant "interest" of their own in the outcome of the contest. Officers of the "target" might well be immediately concerned about holding onto their jobs. Officers of the "raider" might find it in their interest, in terms of maintaining good relations with their superiors, for example, to assist their corporation in its acquisition efforts.

C. *ERISA and the Reliable Trust Investments.* Under ERISA sections 404(a), 406(a)(1)(D) and 406(b)(1), where plaintiffs allege that fiduciaries have used plan assets for their own purposes in a corporate control contest, courts must examine closely the circumstances surrounding the alleged use of plan assets. In this case, several factors are relevant in deciding whether the plan administrators acted solely in the interests of the plan beneficiaries. First, the risk of conflicts between the interests of the fiduciaries and beneficiaries is the key warning signal for possible misuse of plan assets. Second, whether fiduciaries with divided loyalties make an intensive and scrupulous investigation of the plan's investment options may be highly probative of the fiduciaries' loyalties. Third, the consistent management of plan assets in congruence with the fiduciaries' personal interests over a substantial period of time in control contests may be probative of whether the fiduciaries have acted solely in the interests of the beneficiaries. This list is by no means exhaustive, but these are the factors applicable here.

On the record before us, we find that the district court clearly erred when it found that the Reliable Trust's investments in Berkeley, OSI and Hickory were made and held solely in the interests of the plan beneficiaries. We find that Dardick's and Zuckerman's investment of the trust's assets in

---

**22.** Where dealings between the fiduciary and the plan are necessary, the exemptions of 29 U.S.C. § 1108 will adequately protect the fiduciary.

128

Berkeley, OSI and Hickory violated ERISA's fiduciary requirements.

With regard to the Berkeley, OSI and Hickory investments, both Dardick and Zuckerman faced the clear risk of conflicting interests. As fiduciaries of the Reliable Trust, their duty was to promote the interests of the trust beneficiaries. Yet their ties to the Engle group and their involvement in the control contests gave them other interests which clearly could diverge from those of the beneficiaries. For example, as the Engle group began to expand its holdings, it benefited by keeping Berkeley, OSI and Hickory stock prices as low as possible in the short run, thereby reducing the cost of its acquisition plans. The Engle group's success in the control contests depended upon the group's ability to control the largest possible block of shares.

The interests of Reliable Trust beneficiaries were markedly different. Their interests were best served by quickly rising stock prices, which often result from corporate control struggles. They certainly had no interest in preventing or delaying price rises. Further, the interests of the beneficiaries required disposing of the stock if it appeared that the investment had no further profit potential. Thus, if fully independent, the persons administering the trust might have wanted to sell the stock before the rest of the Engle group was in a position to cash in its own position. The beneficiaries were interested in the greatest possible return on their investment, regardless of whether their investments aided one

side or another in a control contest. Further, independent trust administrators might have sold out earlier (or might never have bought in) if they believed that target management was acting contrary to the best interests of the stockholders.

Thus, as unpaid trust administrators, Dardick and Zuckerman faced responsibilities which could have conflicted sharply with the interests of the Engle group (upon which their income depended) in its control contests. Had a time come when a decision had to be made that would hurt the Reliable Trust and help Engle, or vice-versa, while Engle was effectively providing everyone's paycheck, we think it unrealistic to expect that the decision would not go in Engle's favor.[23] To the extent the Reliable Trust and other entities in the Engle group were stockholders in the same target companies, they shared, of course, an interest in the ultimate maximization of the stock values. In that general sense, the interests were not in actual conflict. However, because the plaintiffs have shown that the trust administrators clearly faced potentially conflicting interests and continued to exercise control over the plan assets in ways that directly benefited the Engle group, grave doubts arise concerning the administrators' loyalty. Under these circumstances, it was virtually impossible for the plan fiduciaries to act with complete loyalty to the Reliable Trust beneficiaries and with an "eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth, supra,* 680 F.2d at 271.[24]

**23.** When the plaintiffs filed this action in September 1978, the potential conflicts may well have ripened into actual conflicts. The plaintiffs sought immediate distribution of their trust interests, and, as we discuss below in Part V, they may well have been entitled to immediate distribution. When the lawsuit was filed, the Reliable Trust still held its shares of OSI and Hickory, and the control contests for those companies were not over. Yet the trust administrators did not distribute most trust assets until after the control contests had ended. The district court found that the delays were reasonable, and we vacate that finding in Part V. On the record before us, we are reluctant to reverse the district court's finding and hold that the delayed distribution violated ERISA as a matter of law. We leave to the district court

on remand the issues whether the fiduciaries' actions in delaying distribution violated the trust instruments or ERISA's standard of loyalty.

**24.** The potential conflicts in the case before us seem, on the surface, at least, less severe than the one faced by the trust administrators in *Donovan v. Bierwirth,* where the administrators' positions in target management, and their presumed concern for their own jobs, might have been influences strongly adverse to the trust's interests as a stockholder. Nonetheless, the potential conflicts in this case were substantial enough to create the risk of misuse of plan assets.

Because of the other factors present in this case, we need not decide whether the potential conflicts alone amounted to ERISA violations. Where they faced these clearly conflicting loyalties, Dardick and Zuckerman undertook no genuinely independent investigation of the trust's investment options. At the very least they should have realized that their ties to the Engle group and their interests in the control contests cast serious doubt on their ability to act solely in the interests of the beneficiaries. Yet before the trust purchased the stocks and throughout the several control contests, Dardick and Zuckerman failed to seek independent advice which might have clarified where the interests of the beneficiaries lay.

Defendants contend that the trust's Berkeley purchases were prudent investments made upon the advice of the professional investment advisor, Charles Newbill. The reliance on Newbill's advice does not alter our conclusion that the investments were not made for the exclusive purpose of providing benefits to plan beneficiaries. On the contrary, in light of Newbill's ties to the entire Engle group, *see supra* Part I–A, his blessing of the trust's investments only adds support to the inference that the trust purchases were part of the Engle group's investment and acquisition program. First, at the time Newbill proposed the Berkeley investments to Dardick, Newbill's only paying client was Libco. The bill Newbill submitted to the Reliable Trust for the advice was prepared nine months after the purchases and three months after this lawsuit was filed. Newbill apparently made his recommendations in several conversations with Dardick during early 1978 and in several brief memoranda dated a few days before the trust made its purchases. *See* Defendants' Exhibits ZZ and AAA. Dardick and Zuckerman clearly knew of Newbill's involvement with Engle and Libco, and they were aware of Engle's and Libco's interest in the three companies. If Dardick and Zuckerman had been acting independently, we do not see how they could have failed to make their own investigation or to seek the advice of someone not involved in the Engle group's acquisition efforts.[25]

Thus it is clear that the Reliable Trust investments in Berkeley, OSI and Hickory were made by administrators who faced conflicting loyalties and who made no effort to obtain independent advice regarding these investments and the interests of the trust beneficiaries. When we also examine the timing of the trust's investment decisions and their relationship to the actions of other members of the Engle group, it is clear that the trust's investments were not made with an "eye single" to the interests of the participants and beneficiaries. *Donovan v. Bierwirth, supra*, 680 F.2d at 271. Instead, the trust investments were made at least in part to enhance the Engle group's position in the several control contests.

---

**25.** Defendants argue further that the Berkeley purchases, as well as those of OSI and Hickory, were prudent and made to diversify the trust's assets. To support this claim, defendants point to the testimony of Lee Meyer, a Harris Bank officer, who testified that the Harris Bank had also purchased Berkeley shares in the Special Capital Fund it managed for many employee benefit plans. Defendants' Brief at 19, 38. However, Meyer also testified that the Special Capital Fund was "a highly speculative fund, high risk fund," and a "go-go fund." Transcript at 613, 620. He testified that the bank never put more than 5% of any single trust's assets in the Special Capital Fund because the investments were high risk. Transcript at 613. The narrow issue of prudence is not precisely before us on this appeal. However, the speculative nature of the Reliable Trust's investments and the fact that the investment in Berkeley apparently appreciated primarily through the use of litigation as an economic weapon indicate whether the plan administrators acted with unswerving loyalty to the trust beneficiaries.

Additionally, defendants point out that the Reliable Trust's investments had all been held in the form of fixed income securities until March 1978, and that they were required to diversify these holdings. *See* 29 U.S.C. § 1104 (a)(1)(C). We do not question the need for diversification; in the abstract, it was entirely proper for the trust to purchase common stocks. However, the problem in this case is the particular choice of stocks in light of the other defendants' holdings in Berkeley, OSI and Hickory, and in light of the administrators' own interests, previously discussed, in these companies. A general need or desire for diversification cannot serve to justify the choice of the stocks purchased in this case.

The timing of the Reliable Trust purchases of Berkeley stock in relation to other actions of the Engle group shows that the trust assets were not used exclusively to further the interests of the trust beneficiaries. In late February 1978, Engle learned of the proposed deal between Berkeley management and the Cooper group trying to take over the company. At that time, Engle believed that the proposed deal would work to the disadvantage of minority shareholders such as himself and GSC. Although they faced the danger of being "locked-in" as minority shareholders under hostile management, Engle and GSC purchased an additional 11,200 shares between February 27th and March 10th, increasing the Engle group's Berkeley holdings from 3.5% to 4.0% by March 10th. Then, on March 22, 1978, letters were sent on GSC letterhead to the outside directors of Berkeley protesting the proposed Berkeley-Cooper deal. The letters were sent in Engle's name, but Dardick (who was, of course, at the same time the Reliable Trust administrator) prepared the letters and signed them for Engle. On April 7, 1978, Sierra, Engle and GSC filed suit against Berkeley and Cooper in the federal district court for the Northern District of Illinois. The complaint sought to enjoin the proposed deal, and Dardick prepared and signed the complaint. Thus, as attorney for Engle, Sierra and GSC, Dardick was arguing that Berkeley management was acting against the interests of minority shareholders, and he was suing management to stop the Berkeley-Cooper deal.

Meanwhile, between March 17th and March 31st, as administrators of the Reliable Trust, Dardick and Zuckerman were investing over $71,000 of the trust's assets in Berkeley stock. Under their direction, therefore, the Reliable Trust was becoming one of those minority shareholders against whose interests the Berkeley management was supposed to be acting. The Reliable Trust purchases of Berkeley stock increased the Engle group's block of Berkeley shares from 4.0% to 4.65% between March 17 and March 31, 1978. The suit by Engle, Sierra and GSC was settled in June 1978 by having Cooper Laboratories buy at a substantial premium the Berkeley shares owned by the Engle group. The Reliable Trust was not a party to the lawsuit, yet its Berkeley shares were also purchased as part of the settlement.[26]

We believe that undisputed facts in the record show that the Reliable Trust investments in Berkeley were made at least in part for the benefit of other members of the Engle group in their effort to acquire a substantial block of Berkeley shares. Engle's response to the Berkeley-Cooper deal was to gain control of more Berkeley shares and to sue Berkeley management to force a favorable settlement. We can see no reason for including the Reliable Trust shares in the ultimate settlement unless the trust's shares were in fact subject to the Engle group's control in the contest for control of Berkeley. One reason for the trust purchases of Berkeley stock was to increase the Engle group's control of Berkeley and, from the perspective of the trust, to gamble on the outcome of the expected litigation and control contest. As we noted above in Part II, the fact that the gamble paid off for the trust as well as for the rest of the Engle group is no defense in this action for breach of fiduciary duties.

The Reliable Trust investments in OSI stock show a similar pattern. The trust made its investments in OSI very early in the struggle for control of OSI. Before Telco began purchasing OSI stock on April 17, 1978, GSC, Engle and the Reliable Trust owned a total of 24,100 shares, or 1.67% of OSI. The trust owned 12,500 of those shares. Beginning on April 17th, Telco and later Telvest purchased OSI steadily, and the group's holdings grew to 6.2% by the end of May 1978, 9.7% by the end of July, 16% by the end of October, and 21.73% on May 4, 1979. Throughout the period of the Telco and Telvest purchases, the Engle

---

**26.** Of course, Dardick could also have been criticized if the trust shares had *not* been included in the settlement, for then the trust would not have received the control premium offered by Cooper. The dilemma stems from the fact that Dardick owed a fiduciary's duty of loyalty both to the trust and to the other members of the Engle group whose interests potentially diverged from those of the trust.

group fought for control of OSI through litigation, two tender offers and a proxy fight. The Reliable Trust held its OSI shares during this time and ultimately sold them for an enormous profit when the Brown Group tendered $15.00 per share as a "white knight" protecting OSI management.

Dardick acted as attorney for the Engle group in the proxy fight, the tender offers and the ancillary litigation. On behalf of the Engle group he was sharply critical of OSI management and the company's profitability. His efforts were aimed at forcing OSI management to yield control or to purchase the Engle group's shares at a premium. At the same time, Dardick directly controlled the Reliable Trust's investments in OSI, and he directed the Harris Bank to vote the trust's shares in the proxy fight in favor of the Engle group's candidates for the board of directors.

Like the Reliable Trust's Berkeley investments, the OSI investments were made, held and used while the Engle group was engaged in a struggle for corporate control against the incumbent management. The trust administrators and the Reliable Manufacturing board of directors were all deeply involved in those struggles. They had significant interests of their own at stake in the outcome of the struggle. Clearly there was no one who had discretionary authority over the trust investments and who was disinterested in the struggles for corporate control. And throughout the control struggle lasting over a year, the Reliable Trust held its OSI shares and used them in accord with the Engle group's best interests.

The Hickory investments display the same pattern, although Hickory management decided not to resist the Engle group's efforts to gain control of the company. Again, the administrators faced conflicting loyalties, at least until it became clear that the Engle group would be successful in its acquisition efforts. The Engle group wanted to keep the stock price down in the short run, while an independent trust would probably have been interested in quickly rising stock prices. Again, there was no effort to obtain independent advice on the soundness of the trust's purchase and retention of Hickory shares. Throughout the long period during which the Engle group established its position in Hickory, the trust held its shares. Then, after it was clear that the Engle group would succeed, the trust sold its shares at a low point in the market for a net profit of 4%, including a loss on one-third of the shares it purchased. Under these circumstances, we conclude that the district court erred when it found that the defendants fulfilled their duties under ERISA.[27] Dardick and Zuckerman violated their duty of loyalty by investing the trust's assets in Hickory because they were not acting solely in the interests of the beneficiaries.[28]

27. The plaintiffs claim that defendants profited from their Hickory investments primarily through the use of "equity accounting," whereby as investors with "substantial influence" over Hickory, the defendants were able to include their share of Hickory's earnings in their own balance sheets. The district court found that the Reliable Trust's Hickory shares "played no part in the decision by, or ability of, Telco to use the equity method of accounting" with respect to its Hickory investments. Finding of Fact No. 15. That finding, which is not clearly erroneous, is relevant in determining whether and how the defendants profited from the trust's investments in Hickory. However, our conclusion that the investments violated ERISA's standard of loyalty does not depend upon the use of equity accounting or the extent of the profits made.

28. Defendants point out that the trust made all of its Berkeley and OSI purchases, and most of its Hickory purchases, before Telco and Telvest made their larger purchases and before the contests for control began. They contend that these subsequent actions by other parties cannot transform the trust's earlier purchases into breaches of fiduciary duty. However, the argument misses the mark. First, before the trust made its purchases, other members of the Engle group had already begun to establish positions in the three companies, and Newbill was recommending the three companies to Engle and Libco as likely takeover candidates. Telco did not begin its larger purchases until April because it did not receive financing until shortly before the April 21st board meeting. Supplemental Appendix at 425. Most importantly, though, a fiduciary's duty is not limited merely to purchases. During the control contests the administrators also faced the continual choice of holding or selling their shares in the contested companies. Where the administrators faced the conflicting loyalties present in this case, their actions in *holding* the shares had the

We conclude, therefore, that Dardick and Zuckerman violated their fiduciary duties under section 404(a), section 406(a)(1)(D) and section 406(b)(1) of ERISA by investing the Reliable Trust's assets in Berkeley, OSI and Hickory. We reach that conclusion because the fiduciaries had divided loyalties with clear potential for conflicts of interests, because the fiduciaries with divided loyalties failed even to seek independent, disinterested advice regarding these investments and their duties to the plan beneficiaries and because, throughout prolonged contests for corporate control, the fiduciaries' use of the trust assets dovetailed at all times with the interests of the Engle group.[29] Were we to reach another result in this case, we do not see how the interests of ERISA plan beneficiaries could be protected from those who would use trust property in contests for corporate control. The fiduciary's duty of loyalty is exacting, and the Reliable Trust administrators' use of the assets entrusted to them falls substantially short of that exacting standard.

Benefit plans subject to ERISA control an enormous pool of capital in today's economy. With their extensive investments in securities, they will frequently face difficult investment decisions in contests for corporate control. Therefore we emphasize that our finding of a breach of fiduciary duty in this case is predicated on the fiduciaries' intimate involvement with and interest in the other parties to the struggle for control. Where the plan fiduciary has interests outside the plan in a control struggle—interests which the benefit plan may be in a position to further or to impair—the risk is too great that the fiduciary will be unable to act as ERISA requires—solely in the interest of the plan beneficiaries.

As a practical matter, we view favorably the suggestion of the Secretary of Labor, as *amicus curiae,* that the preferred course of action for a fiduciary of a plan holding or acquiring stock of a target, who is also an officer, director or employee of a party-in-interest seeking to acquire or retain control, is to resign and clear the way for the appointment of a genuinely neutral trustee to manage the assets involved in the control contest.[30] Otherwise, the risk is too great that the trustee will come to a crossroads where the interests of the plan and the party-in-interest diverge. For example, while the party-in-interest may be seeking to accumulate as many shares as possible in order to maintain or acquire control, a plan's interest in maximizing its investment return may require it to tender its shares to a competing bidder for shares.[31]

The resignation of the interested fiduciary would also have the benefit of obviating in many cases the need for courts to sift through the complicated events surrounding a takeover in an attempt to gauge the prudence and motivations of trustees. Though neutral trustees will have the same fiduciary duties, we think it likely that the mantle of seeming objectivity worn by a

---

effect of putting them in breach of their fiduciary obligations under ERISA. *See Donovan v. Bierwirth,* 680 F.2d at 272–74 (applying fiduciary standards to decisions to hold stock).

**29.** We emphasize here that it is not *per se* impermissible for employee benefit plans to invest in companies involved in control contests or to ally themselves with one side or another in a control contest. The central issue is the *independence* of the plan fiduciaries who must always be able to act solely for the benefit of those whose funds are entrusted to them. In the case before us, where potential conflicts of interest are present, where the plan administrators are anything but independent and where these administrators fail to undertake any independent investigation of the investments, the long term congruence is additional evidence of the fiduciaries' breach of ERISA's duty of loyalty. The congruence alone would not demonstrate a breach of that duty of loyalty.

**30.** It would not be necessary in all cases for the interested fiduciary to withdraw completely from plan management. The critical step is to have independent persons manage the assets involved in the control contest.

**31.** Our holding in this case does not establish a *per se* rule based on potential conflicts of interest. We need not reach so far because here the fiduciaries with divided loyalties failed utterly to obtain independent advice from disinterested persons and because the trust's investment decisions were always congruent with the Engle group's interests. Nevertheless, we do not reject the *per se* standard here; should the proper case arise, we would need to decide the issue squarely.

neutral trustee will calm the fears of plan beneficiaries who might otherwise perceive the need to resort to the courts in order to ensure the safety of their entitlements.

## IV.

We must also consider whether Clyde Engle and Libco are fiduciaries with respect to the Reliable Trust's investments and, if so, whether they breached their fiduciary duties. ERISA provides that:

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A). The district court found that Engle did not have control or authority over the investment of plan assets except through his participation in the appointment of the plan administrators. Finding of Fact No. 21. The court concluded that Engle and Libco were not fiduciaries with respect to the plan's administration and investment. Conclusion of Law No. 7.

Plaintiffs argue that Engle and Libco come within the scope of section 1002(21)(A)(iii), which makes one a fiduciary to the extent a person "has any discretionary authority or discretionary responsibility in the administration of [a] plan." [32] Plaintiffs contend that Engle and Libco had such discretionary authority over the plan by virtue of Engle's control of Libco and Libco's 100% ownership and control of Reliable Manufacturing: Libco had the power to appoint and remove the directors of Reliable (Engle, Zuckerman and Contarsy) who,

in turn, had the power to appoint and remove the trust administrators (Dardick and Zuckerman). Therefore, plaintiffs argue, "By virtue of their ability to control appointments of Reliable Trust Administrators, Libco and Engle were fiduciaries." Brief of Appellants at 23.

It is clear that Engle and Libco are fiduciaries to the extent that they performed fiduciary functions in selecting and retaining plan administrators. ERISA recognizes that a person may be a fiduciary for some purposes and not others. The defendants contend that although Engle and Libco may be fiduciaries for the purpose of selecting and retaining plan administrators, that status does not make Engle and Libco fiduciaries with respect to the administrators' investment decisions.

Defendants' argument that ERISA ties fiduciary responsibilities to a person's actual authority is correct. The key language in the statutory definition is that a person is a fiduciary "to the extent" he or she exercises control or authority over the plan. The Secretary of Labor explained this language in a bulletin interpreting ERISA, which was published in the Code of Federal Regulations. In this bulletin, the Secretary was asked the following question and gave the following response:

D–4 Q: In the case of a plan established and maintained by an employer, are members of the board of directors of the employer fiduciaries with respect to the plan?

A: Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section 3(21)(A) of the Act. For example, the board of directors may be responsible for the selection and retention of plan fiduciaries. In such a case, members of the board of directors exercise "discretionary authority or discretionary control respecting management of such plan" and are, therefore, fiduciaries with re-

---

**32.** Plaintiffs do not challenge on appeal the district court's conclusion that Telco and Tel-

vest are not fiduciaries. *See* Brief for Appellants at 22–26.

spect to the plan. *However, their responsibility, and consequently, their liability, is limited to the selection and retention of fiduciaries* (apart from co-fiduciary liability arising under circumstances described in section 405(a) of the Act). In addition, if the directors are made named fiduciaries of the plan, their liability may be limited pursuant to a procedure provided for in the plan instrument for the allocation of fiduciary responsibilities among named fiduciaries or for the designation of persons other than named fiduciaries to carry out fiduciary responsibilities, as provided in section 405(c)(2).

The Internal Revenue Service notes that it would reach the same answer to this question under section 4975(e)(3) of the Internal Revenue Code of 1954.

ERISA Interpretative Bulletin 75–8, 29 C.F.R. § 2509.75–8 (1983) (emphasis supplied).

■ This court has adopted a similar approach to analyzing fiduciary responsibilities under ERISA. *Brandt v. Grounds,* 687 F.2d 895, 897 (7th Cir.1982); *Chicago Bd. Options Exchange, Inc. v. Connecticut General Life Ins. Co.,* 713 F.2d 254, 259 (7th Cir.1983). In *Brandt,* we affirmed the dismissal of an action against a bank that had allowed a plan trustee to withdraw $175,000 from the plan's accounts. The trustee had obtained the money by forging, or by obtaining under false pretenses, the signature of another trustee. In addition to alleging a breach of the bank's duties as a depository for accepting the forged instruments, plaintiffs alleged that the bank had breached its fiduciary duties under ERISA by acting imprudently in violation of the prudent man standard of 29 U.S.C. § 1104(a)(1)(B). This court agreed that the bank may have been a fiduciary as a result of its providing investment advice for a fee, 29 U.S.C. § 1002(21)(A)(ii), but we held that "its fiduciary status existed only 'to the extent' that it provided that advice .... Thus, it appears that the personal liability of the Bank would be limited to its violations of 29 U.S.C. § 1104 in performing its investment advising functions." 687 F.2d at 897. The bank therefore was not a fiduciary with respect to its functions as a depository.

Similarly, in *Chicago Board,* we held that Connecticut General was a fiduciary because it had discretionary authority over management of plan assets by virtue of Connecticut General's power to amend its annuity contract with the Chicago Board Options Exchange. We noted, however, that Connecticut General's fiduciary status "only governs actions taken in regard to amending the contract and does not impose fiduciary obligations upon Connecticut General when taking other actions." 713 F.2d at 259.

Because Engle and Libco were fiduciaries with respect to the selection and retention of the plan administrators, the issue here is not whether they were fiduciaries but instead whether their fiduciary duties extended to the Reliable Trust investments in Berkeley, OSI and Hickory. The district court limited its analysis of this question to whether Engle and Libco directly exercised control over the Reliable Trust's investments. That analysis was too limited in scope.[33] The fact that Engle and Libco had

---

**33.** Under the district court's analysis, Engle and Libco were not fiduciaries with respect to the investments because plaintiffs did not show that Engle and Libco exercised direct control over the investments. On paper, it is true, Engle's authority over the Reliable Trust could be exercised only indirectly through his membership on the Reliable Manufacturing board which appointed the plan administrators. On paper, Libco could control the trust only through its power to appoint the Reliable Manufacturing board which in turn appointed the Reliable Trust administrators. However, we think ERISA directs courts to look beyond Engle and Libco's formal authority with respect to

the plan, limited to selection and retention of administrators, and to consider what real authority they had over plan investments by virtue of their having appointed Dardick and Zuckerman to be administrators. *See Fulk v. Bagley,* 88 F.R.D. 153, 162 (M.D.N.C.1980) ("in defining 'fiduciary' Congress was peculiarly concerned with realities, as distinguished from mere formalities."); *Eaves v. Penn,* 587 F.2d 453, 458 (10th Cir.1978).

By selecting Dardick and Zuckerman to administer the plan, Engle and Libco presumably obtained substantial *de facto* control over plan investment decisions. Dardick was Engle's

only limited fiduciary responsibilities does not mean that they had no responsibilities whatever. As the fiduciaries responsible for selecting and retaining their close business associates as plan administrators, Engle and Libco had a duty to monitor appropriately the administrators' actions. 29 U.S.C. §§ 1104(a)(1), 1105(a) and 1105(c). *See* RESTATEMENT (SECOND) OF TRUSTS §§ 184, 224 (1959). Engle and Libco could not abdicate their duties under ERISA merely through the device of giving their lieutenants primary responsibility for the day to day management of the trust. Engle and Libco were obliged to act with an appropriate prudence and reasonableness in overseeing Dardick's and Zuckerman's management of the Reliable Trust. *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 640 (W.D.Wis.1979). *See also Shaw v. International Ass'n of Machinists and Aerospace Workers Pension Plan,* 563 F.Supp. 653, 657 (C.D.Cal.1983).

The record shows that Engle was aware of the Reliable Trust's investments in Berkeley, OSI and Hickory, and that he also knew of Dardick's role and interest in the Engle group's acquisition efforts. He presumably should have been aware that Dardick—for whose appointment he was directly responsible—faced conflicting loyalties with respect to those investments. Engle also knew of Zuckerman's ties to the Engle group. Zuckerman was president of Reliable Manufacturing, a member of its board and administrator of the Reliable Trust, but he received no compensation for any of these positions. He was paid by Engle only as a consultant to Libco and as a member of the Libco board. Zuckerman thus had substantial interests of his own in the outcome

of the Engle group's acquisition efforts, and Engle knew of those interests which created conflicting loyalties for Zuckerman as administrator of the Reliable Trust.

Libco was also aware of the Reliable Trust's investments and Dardick's and Zuckerman's conflicting interests. All three members of the Reliable Manufacturing board of directors—Engle, Zuckerman and George Contarsy—were also members of Libco's board of directors. Engle was chairman of the Libco board and held a controlling interest in Libco. Libco, of course, controlled the Reliable Manufacturing board which appointed and oversaw the Reliable Trust administrators, who faced such markedly conflicting interests in managing the trust's investments. Documents filed by Libco with the Securities and Exchange Commission show that Libco knew of the Reliable Trust's investments in Berkeley, OSI and Hickory.[34]

The question thus becomes whether Engle and Libco fulfilled their duties under section 404 and section 405 in light of their knowledge that the Reliable Trust administrators who managed the trust assets faced conflicting loyalties with respect to those investments. Engle and Libco were not obliged to examine every action taken by Dardick and Zuckerman, but under these circumstances, we think that Engle and Libco were obliged to take prudent and reasonable action to determine whether the administrators were fulfilling their fiduciary obligations. Engle and Libco could not abdicate all of their responsibilities by appointing Dardick and Zuckerman, nor could they insulate themselves from all fiduciary

---

personal attorney and general counsel to the business enterprises controlled by Engle—Libco, Telco, Telvest, GSC, the Bank of Lincolnwood and Sierra. Most, if not all, of his income was under Engle's direct control. Further, while the Reliable Trust was investing in Berkeley, OSI and Hickory, Dardick was at the same time assisting Engle, Libco, Telco and Telvest in their acquisition programs and litigation against the same three companies. Dardick was thoroughly aware of how the Trust's investments would affect those acquisition programs. There would have been no need for

Engle to instruct Dardick about how to use the trust assets. However, plaintiffs have not shown that the district court clearly erred in finding that Engle and Libco did not exercise authority over the trust's investments in Berkeley, OSI and Hickory. But the analysis here is more properly focused on whether Engle and Libco fulfilled the duties of surveillance and oversight which stemmed from their power to select and retain the plan administrators.

**34.** *See supra* notes 11, 13 and 14.

liability by limiting their roles in the administration of the trust.

Nothing in the record now before us shows that Engle or Libco took steps either to insure that Dardick and Zuckerman were fulfilling their fiduciary obligations or to remedy any violations which might have already occurred. However, because the district court's analysis of this issue was so limited, the district court should consider this issue on remand so that the parties may address themselves directly to whether Engle and Libco acted reasonably and prudently in light of their knowledge of the administrators' conflicting interests and the trust's investments. Therefore, we vacate the district court's conclusion that Engle and Libco were not fiduciaries with respect to the trust's Berkeley, Hickory and OSI investments, and we remand for further proceedings on the question of their liability as fiduciaries.

### V.

Plaintiffs also allege that the Reliable Trust terminated as a matter of law, either wholly or partially, in March 1979 when Reliable Manufacturing discharged seventy-five of its eighty-one employees and went into involuntary and then voluntary bankruptcy proceedings. They claim that Dardick and Zuckerman as administrators and the National Boulevard Bank as trustee breached their fiduciary duties by delaying distribution of the trust after its legal termination.

The dispute over the termination of the plan and distribution of plan assets arose only after this litigation was initiated. On February 8, 1979, plaintiffs moved in the district court for appointment of a receiver to distribute vested funds in the Reliable Trust. In early March 1979, as noted, Reliable Manufacturing went into involuntary bankruptcy proceedings, and seventy-five of its eighty-one employees were laid off. Later in March, the bankruptcy proceedings were converted to voluntary proceedings under Chapter 11. Under applicable Internal Revenue Service regulations and the terms of the Reliable Trust instruments, the plan may have terminated when Reliable Manufacturing began to discharge its employees and went into bankruptcy, and the plan beneficiaries may have been entitled to an immediate distribution of their shares in the trust. See Plaintiffs' Exhibits 7 and 8; 26 C.F.R. § 1.401–6 (1983). Beginning on March 1, 1979, attorneys for the Reliable Trust engaged in extended correspondence with the Internal Revenue Service seeking a determination of whether the trust had partially terminated. They described the lay-off of the seventy-five employees as "temporary" and "seasonal" in their letter to the IRS.

The district court denied the motion to appoint a receiver on May 30, 1979. Dardick and Zuckerman delayed distribution of the vested funds through the summer, saying they were waiting for the IRS to advise them. Then, on September 14, 1979, Dardick and Zuckerman asked the district court to approve a notice to be sent to plaintiff beneficiaries. The proposed notice offered the plaintiffs the following choice. First, they could receive immediate payment of all vested funds, but only if they released the defendants from all liability, including liability in this case. Second, if they did *not* release the defendants from liability, the plaintiffs would receive their vested funds only over a ten-year period, subject to an unspecified reserve. The district court denied the defendants' request, and most trust funds were distributed in 1980 in return for releases not affecting rights in this case.

The district court found that the plan administrators acted reasonably in seeking the determination from the IRS and in setting aside a substantial reserve for attorney fees, accounting and other expenses. In its findings of fact and conclusions of law, the district court did not mention the attempt to make distribution of vested funds to plaintiffs contingent on a release from liability in this case. Nor did the district court address the proper application of the Reliable Trust instruments and the Internal Revenue Service regulations concerning termination of employee benefit plans. Fur-

ther, the district court appears not to have considered the effect of the clear conflict of interests that crystallized when this litigation was filed. *See supra* note 23. Finally, the district court's findings of fact and conclusions of law are inconsistent in regard to the apparently important question whether the IRS determination was sought before or after the beginning of the bankruptcy proceedings.[35] Therefore, we vacate the district court's findings with respect to the delayed distribution of the Trust and damages which plaintiffs might have suffered from the delay. On remand the district court should consider when the Reliable Trust terminated and whether Dardick, Zuckerman and the National Boulevard Bank violated their fiduciary duties by delaying distribution of the Trust after bankruptcy proceedings had begun, by seeking an IRS determination regarding the termination of the plan, and by delaying distribution while seeking to make distribution contingent on releases from liability in this lawsuit. The court should also consider whether Engle and Libco fulfilled their fiduciary duties in overseeing the administrators' actions in delaying distribution. *See supra* Part IV. In addition, the court should also consider the extent, if any, to which plaintiffs may have been damaged by the delayed distribution of plan assets.

## VI.

On remand the district court will face the formidable task of finding an appropriate measure of damages, if any, with regard to all defendants found to be liable as fiduciaries. Of course, the starting point for the inquiry is the language of 29 U.S.C. § 1109(a), which provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable ... to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary....

Plaintiffs contend that they are entitled to *all* profits made by Engle, Libco, Telco, Telvest, Dardick and Zuckerman in their own investments in Berkeley, OSI and Hickory. The plaintiffs' argument reaches too far, for it ignores the limiting words, "made through use of assets of the plan." 29 U.S.C. § 1109(a). We believe that this language of section 1109 permits recovery of a fiduciary's profits only where there is a causal connection between the use of the plan assets and the profits made by fiduciaries on the investment of their own assets. *Cf. Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir.1982) (plaintiffs must prove causal connection between plan losses and breaches of fiduciary duty). The Reliable Trust investments in Berkeley, OSI and Hickory were relatively small in proportion to the investments made by the whole Engle group.[36] If plaintiffs were to recover all profits made by all defendants in these transactions, the recovery could double or triple the size of the trust.

On remand the district court should determine whether the profits made by each defendant found to have breached his or its fiduciary duties are attributable, in whole or in part, to the Engle group's use of the

---

**35.** In its Finding of Fact No. 17, the district court said the defendants acted reasonably in seeking the IRS determination *before* bankruptcy proceedings began. In its Conclusion of Law No. 14, the court concluded that the defendants' decision to seek the IRS determination *subsequent* to the beginning of bankruptcy proceedings was not arbitrary or capricious. The precise timing of these events could be decisive in light of 26 C.F.R. § 1.401–6(b)(1) (1983) and § 9.1(b) of the agreement establishing the Reliable Trust.

**36.** The table below shows the investments in Berkeley, OSI and Hickory by the Reliable Trust, investments by all members of the Engle group, including the trust, on April 16, 1978, before the Telco purchases, and the maximum holdings of the Engle group in each company. Percentages are percentages of each company's total outstanding shares.

| | Berkeley | OSI | Hickory |
|---|---|---|---|
| Reliable Trust holdings | 0.65% | 0.87% | 0.67% |
| Engle group holdings on April 16, 1978 | 4.64% | 1.68% | 4.88% |
| Maximum holdings of Engle group | 10.70% | 21.73% | 52.80% |

*See* Short Appendix at 29–33.

trust and its assets. We recognize that in the context of a contest for corporate control, this inquiry into causation may be exceedingly difficult. Where, for example, the success and profitability of substantial minority investments depended upon the total amount of stock accumulated, it may be difficult to determine how much of the profit, if any, was attributable to the marginal increase in the group's block of shares contributed by the Reliable Trust. Also, the timing of the trust's investments may be relevant. Although the trust's investments in the three companies were small in proportion to the Engle group's total investments in the companies, the trust investments were made very early in the control contests, when it may have been particularly valuable to acquire the first shares discreetly. We offer these observations, which are, of course, speculative, by way of suggestion to the district court in unravelling an extraordinarily difficult damages issue. There may well be other important considerations which the district court will discover when the parties present evidence which explores the issue of causation.

■ The problem of apportioning a wrongdoer's profits between those produced by his or her own legitimate efforts and those arguably resulting from his or her wrong is familiar to courts in other areas of the law. Where ERISA is silent as to how profits should be apportioned, we draw on those other areas of law for guidance. Perhaps the closest analogy is the apportionment of a copyright infringer's profits. The owner of a copyright may recover the infringer's profits, but only those attributable to the infringement and not to the infringer's own efforts and talents. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 49 (2d Cir.1939) (L. Hand, J.), aff'd, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed.2d 825 (1940). Where an infringer's profits are the product of both the infringer's own efforts and the infringement, a precise calculation

is virtually impossible, yet justice requires that courts make estimates. In making an estimate, because the defendants are responsible for "mingling the plaintiffs' property with their own," doubts should be resolved against the defendants so that the amount awarded "will favor the plaintiffs in every reasonable chance of error." *Sheldon, supra,* 106 F.2d at 51.[37] Patent infringement decisions under a prior statute with similar provisions requiring the disgorgement of profits took a similar approach to apportioning profits. *See Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.,* 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 (1915); *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.,* 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222 (1912).

This case is also similar to the common law problem in which a trustee commingles trust assets with his or her own so that it is difficult to discern which property and profits belong to whom. In a suit against the trustee, the trustee has the burden of showing which property and profits are his. The trustee is responsible both for the difficulty and for resolving it. *See* 5 A. SCOTT, THE LAW OF TRUSTS § 515 at 3612 (3d ed. 1967); 1 G. PALMER, THE LAW OF RESTITUTION § 2.13 (1978); *Grodsky v. Sipe,* 30 F.Supp. 656, 661 (E.D.Ill.1940); *Winger v. Chicago City Bank & Trust Co.,* 394 Ill. 94, 111, 67 N.E.2d 265, 277 (1946).

■ Based on the treatment of these similar problems of apportionment, we believe that the burden is on the defendants who are found to have breached their fiduciary duties to show which profits are attributable to their own investments apart from their control of the Reliable Trust assets. It is conceivable that the defendants who have breached can show they received no benefit at all from use of the trust assets. In any event, while the district court may be able to make only a rough approximation, it should resolve

---

**37.** When *Sheldon* was decided, the Copyright Act provided that the infringer would be liable for, among other things, "all the profits which the infringer shall have made from such infringement...." 17 U.S.C. § 25(b) (1934).

With respect to its causation element regarding profits, this provision is quite similar to the language of ERISA, 29 U.S.C. § 1109(a), which we apply here.

doubts in favor of the plaintiffs. *Sheldon, supra,* 106 F.2d at 51.[38] This course should avoid the two unfair results of depriving defendants of the profits earned by their own efforts or depriving the plaintiffs of any recovery simply because the defendants have made it difficult to disentangle commingled profits.

We believe that this approach to the damages in this case is also in accord with the overall purpose of ERISA and the flexible remedial powers provided in 29 U.S.C. § 1109(a). The primary purpose of ERISA is to protect the interests of plan beneficiaries, and the disgorgement requirements of section 1109(a) are intended to promote their interests by removing the fiduciary's incentives to misuse trust assets. Yet that provision would be of little value if, in cases such as this, beneficiaries confronted an insurmountable obstacle in proving the extent of a fiduciary's profits. *See Brink v. DaLesio,* 667 F.2d 420, 426 (4th Cir.1981) (burden of proof on trustee to show that prohibited transaction did not damage trust). We read section 1109(a), providing that the fiduciary "shall be subject to such other equitable or remedial relief as the court may deem appropriate," as authorizing us to cast the burden of proof on the defendants here to ensure that the disgorgement remedy is effective.

On remand, therefore, the district court should determine the extent of the defendants' profits, if any, made "through use" of the Reliable Trust assets. In doing so it must remember that the need for apportionment arose on account of defendants'

breaches of their fiduciary duties. Plaintiffs must be denied a windfall but must receive the benefit of such reasonable doubts as appear.

In addition, some defendants may be liable as fiduciaries for damages resulting from delays in distribution. *See supra* Part V.

## VII.

The district court also awarded costs and fees to all defendants, and it found that Dardick, Zuckerman and the National Boulevard Bank were entitled as fiduciaries to reimbursement for costs and attorneys' fees from the assets of the Reliable Trust. One law firm has represented all defendants in this case. The awards of costs and attorneys' fees to all defendants cannot stand.

ERISA provides that the district court in its discretion may award attorneys' fees to any party, 29 U.S.C. § 1132(g)(1), but the court's discretion is not unbounded. The courts have developed standards for the exercise of their discretion in awarding attorneys' fees under ERISA.[39] The district court made no findings and apparently undertook no analysis that would justify an award of fees to any defendants. From the record we can discern no grounds for the district court's fee award, and therefore we would have to vacate the award to all defendants even if we were to affirm the district court's judgment on the merits. *Cf. Janowski v. International Brotherhood of Teamsters Local No. 710 Pension Fund,* 673 F.2d 931, 941 (7th Cir.1982) (upholding fee

---

**38.** The *Sheldon* rule was adopted in light of the common law of trusts. "[A]n infringer carries the burden of disentangling the contributions of the several factors which he has confused. The law requires him to resolve any doubts arising from his wrong; he is like any other constructive trustee." 106 F.2d at 48 (citing *Callaghan v. Myers,* 128 U.S. 617, 666, 9 S.Ct. 177, 191, 32 L.Ed. 547 (1888)).

**39.** In deciding whether to award fees, the court should consider several factors, including: (1) The degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the oppos-

ing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.
*Marquardt v. North American Car Corp.,* 652 F.2d 715, 717 (7th Cir.1981) (quoting *Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446, 452 (9th Cir.1980)). Even where the plaintiff does not prevail on his or her claim, an award of attorneys' fees against an ERISA plaintiff will rarely be justified. *See Marquardt, supra,* 652 F.2d at 719–20.

award where basis for award could be discerned from record), *vacated on other grounds,* —— U.S. ——, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983).

■ In any event, because we hold that Dardick and Zuckerman violated their duties to administer the Reliable Trust solely in the interest of the beneficiaries, we reverse the award of fees and costs for those defendants. Where an ERISA beneficiary substantially prevails on the merits of his or her claim, an award of fees with respect to such a claim against the party in question would almost always be an abuse of discretion. *See Miles v. New York State Teamsters Conference,* 698 F.2d 593, 602 (2d Cir.) (vacating award of fees to plaintiffs where judgment for plaintiffs was reversed on appeal), *cert. denied,* —— U.S. ——, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); *Kemmis v. McGoldrick,* 706 F.2d 993, 997–98 (9th Cir. 1983) (vacating fee award to employer where judgment for employer was reversed on appeal).

Because we vacate the district court's conclusions that Engle, Libco and the National Boulevard Bank are not liable as fiduciaries, we also reverse the award of fees and costs to them. Plaintiffs may still show that these defendants breached their duties to the trust and its beneficiaries, so any award of fees is premature. Also, even if Engle, Libco and the bank had prevailed on the merits, the district court's failure to establish a basis for the fee award and the problems of apportionment where one firm of attorneys represents all defendants would require us to vacate the fee award to these defendants.

Plaintiffs have not prevailed on the merits against Telco and Telvest, but we must vacate the award of attorneys' fees to Telco and Telvest. As we noted above, because the district court failed to analyze the factors relevant for awarding fees under ERISA, there is no basis in the record for the award of fees to Telco and Telvest. Further, because all defendants in this case were represented by one law firm, and because we reverse the award of fees to Dardick, Zuckerman, Libco, the bank and En-

gle, it is now impossible to determine Telco's and Telvest's shares of the total defense costs. In any event, we question whether the factors relevant to ERISA fee awards would justify a fee award for Telco and Telvest. Therefore, we vacate this award and leave all other matters involving fee determinations—whether in favor of defendants or in favor of plaintiffs—for the district court on remand.

## SUMMARY

Our treatment of the district court's findings may be summarized as follows. First, we reject the conclusion that Dardick and Zuckerman did not violate their fiduciary duty to act solely in the interests of plan beneficiaries and find to the contrary. We hold that as a matter of law, the investments in OSI, Berkeley and Hickory were not made for the exclusive benefit of the plan beneficiaries. We also vacate the district court's conclusion that Engle and Libco were not liable as fiduciaries with respect to the investments and leave further fact-finding in this respect to the district court.

With regard to the delayed distribution of remaining plan assets, we vacate the district court's findings that the delays were reasonable and did not injure the plaintiffs. On remand the district court should consider whether the delays were proper and whether plaintiffs were damaged in any way by the delayed distribution of their vested funds in the trust. The court should also consider whether Engle and Libco fulfilled their duties with regard to the delayed distribution. In addition, the district court should consider at the first opportunity the desirability of an immediate distribution of all remaining assets in the Reliable Trust.

We reverse the district court's award of attorneys' fees and costs to Dardick, Zuckerman, Engle, Libco and the National Boulevard Bank. We vacate the fee awards to Telco and Telvest. Finally, the district court on remand will need to consider the question of damages with respect to each

defendant found to have violated the fiduciary duties imposed by ERISA.

VACATED AND REMANDED.